CAROLYN COLEMAN, PLAINTIFF–APPELLANT, v. FIORE BROTHERS, INC.; FEDERAL INVESTMENT CORPORATION; MICHAEL IPPOLITO, A/K/A MIKE IPPOLITO, DEFEND-ANTS–RESPONDENTS.

AGNES HOLMES, PLAINTIFF–APPELLANT, v. FIORE BROTH-ERS, INC.; FEDERAL INVESTMENT CORPORATION; JACK FIORE, JR., DEFENDANTS–RESPONDENTS.

FRANK ROBINSON AND BEVERLY ROBINSON, PLAINTIFFS–AP-PELLANTS, v. FIORE BROTHERS, INC.; FEDERAL INVEST-MENT CORPORATION; DOMINICK FIORE, DEFENDANTS–RESPONDENTS.

LILLIAN SHEFFIELD, PLAINTIFF–APPELLANT, v. FIORE BROTHERS, INC.; FEDERAL INVESTMENT CORPORATION; MICHAEL IPPOLITO, A/K/A MIKE IPPOLITO, DEFEND-ANTS–RESPONDENTS.

Argued September 13, 1988—Decided January 19, 1989.

*Madeline L. Houston* argued the cause for appellant (*John Atlas,* Executive Director, Passaic County Legal Aid Society, attorney).

*Gerald B. Goldberg* argued the cause for respondents (*Jacob M. Goldberg,* attorney; *Gerald B. Goldberg* and *Jacob M. Goldberg,* on the brief).

*Gail Chester* argued the cause for *amici curiae* Legal Services of New Jersey and National Consumer Law Center (*Melville D. Miller, Jr.,* President, Legal Services of New Jersey, attorney; Melville D. Miller, Jr., and Nancy Goldhill, on the brief).

*Eric Neisser* argued the cause for *amicus curiae* American Civil Liberties Union of New Jersey (*Eric Neisser,* Legal Director, American Civil Liberties Union of New Jersey, attorney).

*John P. Thurber,* Assistant Deputy Public Advocate, argued the cause for *amicus curiae* Public Advocate (*Alfred A. Slocum,* Public Advocate, attorney).

The opinion of the Court was delivered by

O'HERN, J.

This appeal concerns the proper procedure for resolution of claims by public interest law firms for statutory fees under the New Jersey Consumer Fraud Act, *N.J.S.A.* 56:8–1 to –48. We hold that in the circumstances of this case, the stipulation of settlement dismissing with prejudice a consumer fraud action precluded the subsequent assertion of the claims for attorney's fees. In future circumstances, settlement of the merits of such a consumer fraud claim shall precede settlement of fee claims. Any court-approved settlement, as in a class action, should take account of these requirements.

I.

A.

In New Jersey, we accept, as do most other courts, the premise of the American Rule that ordinarily society is best served when the parties to litigation each bear their own legal expenses. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 *U.S.* 240, 247, 257, 95 *S.Ct.* 1612, 1616–1617, 1621, 44 *L.Ed.*2d 141, 147, 153 (1975); *see Right to Choose v. Byrne,* 91 *N.J.* 287, 316 (1982) ("'sound judicial administration will best be advanced' if litigants bear their own counsel fees * * *." (quoting *Gerhardt v. Continental Ins. Cos.,* 48 *N.J.* 291, 301 (1966))). In selected circumstances when the American Rule has not served the interests of justice, we modified it. Thus in actions for indemnity under an insurance policy, we allowed the recovery of legal fees by the prevailing party in order to make the plaintiff whole and to secure compliance with the insurance contract. *R.* 4:42–9(a)(6).

State and national legislatures have further modified the American Rule in particular classes of cases. Most familiar is the allowance of counsel fees in actions to vindicate constitutional and civil rights. *See Hensley v. Eckerhart*, 461 *U.S.* 424, 103 *S.Ct.* 1933, 76 *L.Ed.*2d 40 (1983). Congress has used this same measure in a wide variety of contexts such as anti-trust violations of the Clayton Act, 15 *U.S.C.* § 15; violations of the Truth in Lending Act, 15 *U.S.C.* § 1640(a)(3); and violations of the Consumer Product Safety Act, 15 *U.S.C.* § 2072.

The sponsor of 42 *U.S.C.* § 1988, the Civil Rights Attorney's Fee Awards Act of 1976, which was enacted in response to *Alyeska, supra,* stated:

> The problem of unequal access to the courts in order to vindicate congressional policies and enforce the law is not simply a problem for lawyers and courts. Encouraging adequate representation is essential if the laws of this Nation are to be enforced. Congress passes a great deal of lofty legislation promising equal rights to all.
>
> Although some of these laws can be enforced by the Justice Department or other Federal agencies, most of the responsibility for enforcement has to rest upon private citizens, who must go to court to prove a violation of law. * * * But without the availability of counsel fees, these rights exist only on paper. Private citizens must be given not only the rights to go to court, but also the legal resources. If the citizen does not have the resources, his day in court is denied him; the congressional policy which he seeks to assert and vindicate goes unvindicated; and the entire Nation, not just the individual citizen, suffers. [122 Cong.Rec. 33,313 (1976) (Statement of Sen. Tunney).]

Such acts are designed as well to promote respect for the underlying law and to deter potential violators of such laws.

Our State policy is similar. As one judge stated, the purpose of such fee awards

> is to ensure effective access to the judicial process for persons with civil rights grievances who have little or no money with which to hire a lawyer. Fee awards are also intended to provide an incentive to competent lawyers to undertake Civil Rights litigation. [*Carlstadt Educ. Ass'n v. Mayor & Council of the Borough of Carlstadt*, 219 *N.J.Super.* 164, 166 (App.Div.1987) (quotation omitted).]

As the Supreme Court noted in *Evans v. Jeff D.*, "it is undoubtedly true that Congress expected feeshifting to attract competent counsel to represent citizens deprived of their civil rights."

475 *U.S.* 717, 731, 106 *S.Ct.* 1531, 1539, 89 *L.Ed.*2d 747, 760 (1986) (footnote omitted).

Although the federal fee-shifting provisions are not identical to the provisions of New Jersey's Consumer Fraud Act, they share the common purpose of ensuring that plaintiffs with bona fide claims are able to find lawyers to represent them. Both are designed to attract competent counsel in cases involving an infringement of statutory rights, to achieve uniformity in those statutes and to ensure justice for all citizens.

A very powerful legislative policy supports the New Jersey Consumer Fraud Act. Our present Governor, then Assemblyman, Thomas Kean, sponsored the Act. Governor Cahill issued a press release on its enactment, which stated that he had signed into law "a bill giving New Jersey one of the strongest consumer protection laws in the nation." *See Skeer v. EMK Motors, Inc.*, 187 *N.J.Super.* 465, 471 (App.Div.1982). The Governor's message emphasized:

> [T]he bill provides a private right of action for consumers against those who violate the Consumer Fraud Act. Under this provision the consumer will be entitled to triple damages, reasonable attorney's fee, and reasonable costs of suit.
>
> The Governor stated that this provision, in his opinion, will provide easier access to the courts for the consumer, will increase the attractiveness of consumer actions to attorneys and will also help reduce the burdens on the Division of Consumer Affairs. [*Id.* at 472.]

The Act contemplates a dual process of enforcement, one funded publicly and one privately. If a consumer is injured by an unconscionable commercial practice, the Attorney General may take up the case, through the Division of Consumer Affairs, and vindicate the consumer's interest. In addition, if the Attorney General fails to act, the consumer may proceed under *N.J.S.A.* 56:8–19. That provision affords consumers the right to bring a private action "in any court of competent jurisdiction" and states that a successful claimant "shall" re-

cover threefold damages plus fees and costs.[1]  The Appellate Division has concluded that although the Attorney General himself could not invoke the fee provisions under the Act, "the Legislature wanted the defendant *in a private action* to suffer a greater financial penalty and to assure that the financial cost to the private plaintiff was minimized and compensation maximized."  *Skeer v. EMK Motors, Inc.*, *supra*, 187 *N.J.Super.* at 471 (emphasis added).

## B.

Settlement of attorney's fees claims in statutory-fee cases raises troublesome issues.  Given that the federal and state legislation serve comparable purposes, it may be helpful for us to trace the evolution of federal doctrine on settlement of counsel fees in statutory-fee cases.  The path of the law has not been linear.  Prior to the United States Supreme Court's decision in *Evans v. Jeff D*, *supra*, many Circuit Courts disapproved of the simultaneous settlement negotiation of both the merits of a case and attorneys' fees.  *See Mendoza v. United States*, 623 *F.*2d 1338, 1352–53 (9th Cir.1980), *cert. denied*, 450 *U.S.* 912, 101 *S.Ct.* 1351, 67 *L.Ed.*2d 336 (1981) (ordinarily discouraging simultaneous negotiations in class actions unless Justice Department participated).  Such courts followed the policy of the Third Circuit in *Prandini v. National Tea Co.*, 557 *F.*2d 1015 (1977).  The *Prandini* Court concluded that negotiation of the fee contemporaneously with the disposition of the merits produced a conflict of interest between the attorney and the client because the attorney has a financial stake in the

---

[1]Although we have never held that counsel fees and treble damages are mandatory under the Act, we have no doubt that there is a strong legislative policy in favor of fees both to make whole the victims of consumer fraud and to deter unconscionable practices.  *See Daaleman v. Elizabethtown Gas Co.*, 77 *N.J.* 267, 273 (1978) (inasmuch as no claim could be raised against a regulated public utility not engaged in commercial activities under the Consumer Fraud Act, the Court had no occasion to address whether treble damages were mandatory or merely authorized).

negotiations. *Id.* at 1021. Because of this conflict, the *Prandini* court ruled that parties should negotiate attorney's fees only after court approval of the settlement of the underlying claim. *Ibid.*

However, in *Evans v. Jeff D., supra*, the Supreme Court approved the simultaneous settlement of merits and attorney's fees and held that plaintiff's counsel may waive attorney's fees in such settlement negotiations. 475 *U.S.* at 741–43, 106 *S.Ct.* at 1544–46, 89 *L.Ed.*2d at 766–77. The Supreme Court went so far as to hold that such a waiver is enforceable even when made under protest as a condition of the defendant's acceptance of the settlement. *Id.* at 729, 106 *S.Ct.* at 1538, 89 *L.Ed.*2d at 758–59.

The majority in *Evans v. Jeff D.* reasoned that the underlying purposes of the Civil Rights Act would be advanced by permitting the waiver of fees and the simultaneous negotiation of such a waiver. *Id.* at 732, 106 *S.Ct.* at 1540, 89 *L.Ed.*2d at 760–61. In the Court's view, it was the coercive effect of the claimant's statutory right to seek a fee award that motivated what it regarded as an exceptionally generous settlement on the merits offer. *Id.* at 741, 106 *S.Ct.* at 1544–1545, 89 *L.Ed.*2d at 766. Whether this weapon would be even more powerful if fee waivers were prohibited was yet another question, the Court maintained, but one that Congress was best equipped to handle. *Id.* at 741–42, 106 *S.Ct.* at 1544–1545, 89 *L.Ed.*2d at 766–67. Concluding that Congress had not commanded that fees be paid whenever a case is settled, it allowed such settlements with fee waivers. *Ibid.*

Justice Brennan, in a dissenting opinion, agreed that there was no statutory impediment to simultaneous settlement of merits and attorney's fees, but concluded that a demand for waiver of such fees should be unenforceable. *Id.* at 760–61, 106 *S.Ct.* at 1554–1555, 89 *L.Ed.*2d at 778. Justice Brennan recognized that there were a variety of ways in which the problem could be handled. He suggested that "one could

require bifurcated settlement negotiations of merits and fees but allow plaintiffs to waive their fee claims during [the fee] phase of the negotiations," or, in the alternative, "one could permit simultaneous negotiation of fees and merits but prohibit the plaintiff from waiving statutory fees." *Id.* at 753, 106 *S.Ct.* at 1551, 89 *L.Ed.*2d at 774. The Justice stated that in the last analysis any practice must be analyzed to determine whether it effectuates the purposes of the legislative plan. *Id.* at 753–54, 106 *S.Ct.* at 1551, 89 *L.Ed.*2d at 774.

## II.

Inasmuch as any of the suggested solutions has some logic to support it, we must choose for our state purposes a solution that will best effectuate the intention of the Legislature. As we have noted, Governor Cahill was emphatic in stating that a primary purpose of fee shifting in these cases is to guarantee the availability of competent counsel. We conclude, therefore, that the federal policies that favor a settlement conditioned on the waiver of attorney's fees do not apply with equal force in this context. The Supreme Court viewed the policy choice as that which best effectuates the intention of Congress and concluded that Congress would have rather the claimants gain relief than the settlement founder over the costs of counsel fees. However, unlike civil-rights claims that might involve extensive injunctive relief for litigants, such as the provision of increased health care services for emotionally retarded children as in *Evans v. Jeff D.,* most consumer fraud claims will primarily provide monetary relief. The equal measure of the claims (the money that consumers might receive versus the money that consumer advocates might receive) enables us to make the judgment of the Legislature's intention with greater confidence.

The problem of attorney-client conflict with respect to attorney fees is not unique to statutory-fee cases. Its prototype arises in the context of the settlement of class action litigation.

*Prandini v. National Tea Co., supra*, 557 *F.*2d 1015. In fact, it has been argued that the *Prandini* rule was a response to the attorney's settlement of fee claims as part of a "sweetheart" deal under which the attorney was paid a generous fee in exchange for an unfavorable merits disposition for the client. Brief for *Amici Curiae*, NAACP Legal Defense and Educational Fund, Inc., Lawyers' Committee for Civil Rights Under Law, American Civil Liberties Union, and Legal Aid Society of New York, in support of respondents, *Evans v. Jeff D.*, 475 *U.S.* 717 [106 *S.Ct.* 1531, 89 L.Ed.2d 747] (1986), (84–1288), *reprinted in*, 14 *N.Y.U.Rev.L. & Soc.Change* 633, 657 (1986). *See also* Levin, *Practical, Ethical and Legal Considerations Involved in the Settlement of Cases in Which Statutory Attorney's Fees Are Authorized*, 14 *Clearinghouse Rev.* 515 (1980) (addressing problems facing attorneys and the dilemma of lump-sum settlement offers) [hereinafter Levin]. Our case has been described as the flip-side of *Prandini*, where

> instead of a generous offer to the lawyer and a paltry one to the client, the defense offers generous terms to the client and little or nothing to the lawyer. A fillip that can make the offer sting more is to condition the offer expressly on the lawyer's explicit agreement to accept a low or no fee. Fee leverage thus can operate in the hands of the defendant either as a bribe or as extortion * * *. [Wolfram, *The Second Set of Players: Lawyers, Fee Shifting, and the Limits of Professional Discipline*, 47 *Law & Contemp.Probs.* 293, 300–301 (1984) (footnotes omitted).]

A variety of solutions to the ethical dilemma have been suggested. *See* Levin, *supra*, 14 *Clearinghouse Rev.* at 520–21 (suggesting written retainer agreement, discussing with client and defense counsel the possibility of conflict, seeking Attorney General guidelines and court approval of settlements). Although a Third Circuit task force recommended conditional negotiations, we conclude, however, that the conditional negotiation of fees is little different from the simultaneous negotiation of fees or the demand that fees be waived. Report of the Third Circuit Task Force, *Court Awarded Attorneys Fees*, *reprinted in* 108 F.R.D. 237, 269 (1985).

Preliminarily, we must address the question whether the rule that we adopt should apply across the board to all counsel in

such cases or be specific to public-interest counsel. A good argument can be made that whatever rule we adopt should be applied to both private counsel and public-interest counsel. The Legislature's purpose is both retributive and deterrent, and both purposes would be advanced by enhancing the fee-shifting policies of the Act. After all, many consumer fraud cases are of small monetary value, and without fee-shifting there may not be much of a pot for the fees of private counsel.

█ Nonetheless, we believe that private counsel will still retain a negotiating chip in consumer fraud cases that public-interest counsel may lack. Because the client remains responsible to private counsel for the fee, attorney and client both have the same interest. The client has a financial interest in seeing the attorney paid by the defendant. Hence, private attorneys can insist, without ethical conflict, on a fee allowance because they would not be reducing their clients' share. In addition, private attorneys can arrange a fee agreement that would allow them to insist upon a statutory fee as part of any settlement. *See Blanchard v. Bergeron*, 831 *F*.2d 563 (5th Cir.1987), *cert. granted*, 487 *U.S.* ——, 108 *S.Ct.* 2869, 101 *L.Ed.*2d 904 (1988) (addressing whether private counsel's contingent fee arrangement limits a § 1988 award). The private attorney will be free then, without impairing client's interests, to insist on vindication of the fee-shifting provisions of the Act. Thus the Act's policy of encouraging counsel to take on these cases is not significantly deterred. In the ordinary non-class, consumer fraud action brought by private counsel, we see no need to alter the general rule that simultaneous negotiation of counsel fees and merits may be entertained.

However, one aspect of the representation of consumers by public-interest counsel requires a different procedure. Unlike their entrepreneurial counterparts at the private bar, for whom the client remains the ultimate source of fees, public interest law firms have no right to receive compensation from their clients. By virtue of their undertaking, they are forbidden such

fees. Hence, the attorney for a public interest law firm who is confronted with a question of simultaneous waiver is prohibited from vindicating the policies of the act because his or her paramount responsibility to the client forbids it. Not only is the lawyer prohibited from accepting a fee from the client, the policies of the non-profit law firms preclude their allowing a claim for a statutory fee to interfere with an advantageous settlement. For them it is "betraying the client."

R.P.C. 1.7(b) of the New Jersey Rules of Professional Conduct provides that a "lawyer shall not represent a client if the representation of that client may be materially limited * * * by the lawyer's own interests * * *." Because the public interest lawyer has no claim upon the pot of money the client may receive, the lawyer has limited negotiation options. As *amicus* counsel stated the point:

> Assume that defendants' counsel offers a settlement of $10,000 for a claim, without any fees. Plaintiff's lawyer must communicate the offer to her client. If she advises the client to reject the claim because no fees are involved, she is limiting her representation by her own interests and knowingly acquiring a pecuniary interest adverse to her client. If plaintiff's lawyer suggests rejection of the offer because it is inadequate, it may reasonably *appear* to the client, and the public at large, that she is modifying her advice to reflect her personal pecuniary interest.

We need not resolve the thorny question of whether it would indeed be unethical for a public interest attorney to refuse to settle a merits claim without the allowance of statutory fees. For such an attorney it is as much a sense of mission as it is a sense of ethics that impels the response. Suffice it to observe that the interests of the public are sufficiently implicated that the problem should not arise.

Passaic County Legal Aid Society is a prepaid legal services corporation funded in part under the National Legal Services Corporation Act, 42 *U.S.C.* §§ 2996a–k. Its special mission is to provide legal representation to needy people and to make real the ideal of equal justice under law. Ordinarily such organizations do not handle fee generating cases: the theory is that the private bar will have a sufficient incentive to take on such litigation. Some consumer claims, however, are either

emergent in nature or of doubtful value. For them, a public-interest law firm may be the only resort. The public-interest counsel argue that in such cases it is appropriate that statutory fees be allowed, not just to vindicate the representation in the particular case but to restore the resources necessarily diverted from a non-fee-generating matter. We were advised at oral argument by public interest counsel that the Consumer Fraud Act is no longer legislation for the poor. It has become, they say, a tool of the privileged. *See Meshinsky v. Nichols Yacht Sales, Inc.*, 110 *N.J.* 464 (1988) (claim that racing boat's engine was defective). Without the bite of counsel fees, the Act, they argue, will become a "dead letter."

We have generally resolved dilemmas posed by the special status of public interest law firms by attempting to harmonize their purpose to the extent possible within our existing disciplinary and professional structures. *In re Advisory Opinion No. 544 of the New Jersey Supreme Court Advisory Committee on Professional Ethics*, 103 *N.J.* 399 (1986) (attorneys for legal-services organizations are bound by the rules governing professional conduct absent client consent or superseding statutory policies); *State v. Bell*, 90 *N.J.* 163 (1982) (unlike private counsel, public defender's office may represent co-defendants). We believe that the New Jersey Consumer Fraud Act's public policy of deterring fraudulent trade practices is best served by precluding public interest counsel from simultaneous negotiation of statutory claims for fees until the merits of the claim have been settled and by precluding defense counsel from attempting such simultaneous disposition. Notwithstanding the presence of contrary public interests, particularly the public interest in settlement of litigation, we believe that we must accommodate our judicial practices to serve the broader purposes evinced by this legislation.

Generations of lawyers trained to "wrap it up" or get to "the bottom line" may find it difficult to operate under this regime. This is natural and understandable, but we do not think the problem will be insurmountable. We rather believe that fair-

minded counsel for defendants will have little difficulty in accommodating their settlement practices to this statutory scheme. Public-interest counsel did not suggest that the defense buy into an open-ended liability. Rather, they agreed that they should and must disclose the hourly charges that they have incurred on a case. In addition, this practice of separation of fees from merits may have the beneficial effect of promoting realistic evaluation of consumer fraud claims with an eye to wrapping them up at the earliest possible moment.

We recognize that the frailties of human nature often account for delay in litigation and thus have allowed for the award of prejudgment interest in negligence actions. *R.* 4:42-11(b). This is a form of cost-shifting designed to foster early evaluation of claims. So too here, the defense lawyer and party both understand that the longer the case lasts, the more it will cost them. Conversely, if the plaintiff or plaintiff's counsel delays a fair settlement, this may serve to reduce the fee award. *Cf. Marek v. Chesny,* 473 *U.S.* 1, 105 *S.Ct.* 3012, 87 *L.Ed.*2d 1 (1985) (rejection of a more favorable settlement may result in costs to the plaintiff).

We are not so naive as not to recognize the many difficulties posed by this solution. Some say that the *Prandini* rule was honored in the breach. Levin, *supra,* 14 *Clearinghouse Rev.* at 516-17. But the breach in that instance was induced by defendants buying their peace from a too-compliant class counsel more interested in a favorable settlement of the attorney's fee than in settlement of his client's merits. In this context, we hardly contemplate that problem arising. We wish to make it clear that our ruling does not require that public-interest counsel demand fees in every consumer-fraud action that they have maintained, only that defense counsel not insist on waiver of fees as a condition for settlement. Our goal is not to foster litigation but justly to vindicate the competing policies of statutory feeshifting and the fair resolution of disputes. Hence, we do not adopt the suggestion of the Public Advocate that fee waivers be barred outright.

### III.

Turning to the facts of the case, it is obvious that our suggested method of settlement was not followed. We accept for purposes of this appeal the factual version of public-interest counsel. Four separate homeowners who had entered home improvement contracts sought protection from the Passaic Legal Aid Society to avoid losing their homes through foreclosure of their installment loans. Two of the homeowners were over seventy-five years old. All were alleged to have been induced to buy aluminum windows at unconscionable prices and duped into mortgaging their homes as security. There was no compliance with Truth–in–Lending Act's requirements, no notice of a right to rescind, and no compliance with consumer-affair regulations. One homeowner was charged $5,000 for twelve windows that cost the defendant only $611 installed. After 18% finance charges were added to the contract, the plaintiff's contract totalled $14,951. If true, these consumer transactions would be demonstrably unconscionable.

When the complainants sought relief, the finance company counterclaimed against the homeowners, claiming the finance company had been misled by the homeowners. The homeowners sought damages and equitable relief under common-law fraud and the Uniform Commercial Code, *N.J.S.A.* 12A:2–302, and treble damages under the New Jersey Consumer Fraud Act, *N.J.S.A.* 56:8–19. They alternatively sought rescission under the federal Truth–in–Lending Simplification and Reform Act. 15 *U.S.C.* § 1635. The homeowners additionally asserted violations of the New Jersey Home Repair Financing Act, *N.J.S.A.* 17:16C–62 to –94, and Door-to–Door Home Repair Sales Act of 1968, *N.J.S.A.* 17:16C–95 to –103. In each case, the complaint sought attorney's fees pursuant to both the New Jersey Consumer Fraud Act and the Truth–in–Lending Act. *N.J.S.A.* 56:8–19; 15 *U.S.C.* § 1640(a)(B)(3).

The cases were settled but in a most unusual fashion. Defense counsel instructed the Passaic Legal Aid Society's staff

attorney to deal directly with the president of Fiore Brothers. Through that attorney's efforts the cases were settled. Defendants agreed to cancel the mortgages. The prices of the windows were reduced to a moderate markup over the supplier prices, and all finance charges were eliminated. In one case, the obligation was reduced from $14,951 to $1,147. Plaintiffs who had paid more than the settlement amounts received refunds. Others agreed to pay balances to defendants. Four plaintiffs saved over $54,000 off their contracts as a result of the settlement.

All of these settlements were reduced to writing. Each agreement stated:

[A]ll claims for damages—actual, punitive and statutory, of the Complaint, and Counterclaim are hereby settled as follows:

[amount payable to defendant or refundable to plaintiff is set forth.] * * * Federal Investment Corp. shall promptly cancel the mortgage it holds on plaintiff's residence.

The complaint, and counterclaim are dismissed with prejudice * * *.

However, the settlement agreement made no reference to legal fees.

After the stipulations were signed by all parties and the attorneys and filed with the court, plaintiffs' counsel then communicated to defense counsel the desire to discuss attorney's fees. Plaintiffs' counsel's position was that she had been unable to conduct simultaneous negotiation of damages and attorney's fees due to an inherent conflict of interest that she perceived to exist between herself and her clients. Defense counsel refused to negotiate or to offer any payment of fees, and responded that counsel had "never stated or even hinted, that [she was] looking for a fee." (Mr. Fiore alleged that he had in fact discussed attorney's fees with claimant's counsel and that the Legal Aid Society's counsel informed him that none of the plaintiffs were paying attorney's fees or seeking fees from the defendants.)

On plaintiffs' motion for attorney's fees, the trial court recognized the strong policies in favor of statutory fees in such cases and the then-existing policy of the Third Circuit to prohib-

it the simultaneous negotiation of merits and statutory fees. However, the trial court concluded that in all of the cases presented to it, *Prandini, supra,* 557 *F.*2d at 1017, *El Club del Barrio, Inc. v. United Community Corps., Inc.,* 735 *F.*2d 98, 100 (3d Cir.1984), and the appeals court decision in *Jeff D. v. Evans,* 743 *F.*2d 648, 650 (9th Cir.1984), *rev'd,* 475 *U.S.* 717, 106 *S.Ct.* 1531, 89 *L.Ed.*2d 747 (1986), the parties knew they were negotiating without regard to fees. Because the lower federal courts were substantially split and the fact that those court decisions are non-binding in a state court proceeding, the trial court maintained that *Prandini* and *El Club del Barrio* gave no "notice to the defendant that settlement negotiations were being conducted in a bifurcated context." In addition, the court noted that defense counsel never tried to force plaintiffs' attorney to waive a fee; rather, plaintiff insisted only that fees had never been discussed. Secondly, defendants did obtain a stipulation of settlement dismissing the pleadings with prejudice. As to any award of fees under the federal Fees Act, the trial court observed that it was bound by the Supreme Court's opinion in *Evans v. Jeff D.* The court thus concluded that negotiated waivers were permissible. On appeal, the Appellate Division in an unreported decision affirmed the trial court's ruling for substantially the same reasons. We granted the plaintiffs' petition for certification to review that decision. 109 *N.J.* 503 (1987).

Before us, plaintiffs contend that as a matter of law the settlement agreement should not be interpreted as including a waiver of attorney's fees unless the agreement expressly contains a waiver. They rely on *Ashley v. Atlantic Richfield Co.,* 794 *F.*2d 128, 130 (3d Cir.1986); *El Club del Barrio, Inc. v. United Community Corp., Inc., supra,* 735 *F.*2d 98, and state cases such as *Folsom v. Butte County Ass'n of Gov'ts,* 32 *Cal.*3d 668, 186 *Cal.Rptr.* 589, 652 *P.*2d 437 (1982), and *Tallon v. Liberty Hose Co. No. 1,* 336 *Pa.Super.* 530, 485 *A.*2d 1209 (1984) (citing *El Club del Barrio, supra,* 735 *F.*2d 98). All such cases are fact-sensitive. The *Folsom* court was divided on the

factual basis for the no-waiver conclusion. The dissenters noted that only delay prevented the filing of a stipulation of dismissal that "would have been curtains for any effort to trigger an encore in the form of fees and costs." 186 Cal.Rptr. at 603, 652 *P*.2d at 451. In both *El Club del Barrio* and *Ashley*, the original settlements had included language referring to attorney's fees that was later removed on objection. In *Ashley, supra*, 794 *F*.2d at 136–37, the subsequent contract specifically excluded liability for attorney's fees after plaintiff's counsel objected to the initial settlement agreement, which waived the fees. In *El Club del Barrio, supra*, 735 *F*.2d at 100, the plaintiff reserved the right to seek attorney's fees in the initial settlement agreement and agreed only to sign a stipulated settlement that was silent.

Absent such an implied reservation of the issue, the Ninth Circuit has held that fees were waived, noting:

The Third Circuit thus concluded *on the basis of the record in those cases* that the absence of an express reference to attorneys' fees in the agreement could not be interpreted as a waiver of the right to seek attorneys' fees. The record in this case is different. It contains no indication that plaintiffs made any attempt to exempt attorneys' fees from the language of the proposed settlement agreement.

· We are in full agreement with the Third Circuit's resolution of both the *El Club del Barrio* and *Ashley* cases. Waiver of attorneys' fees should not be presumed from a silent record. However, the release in this case is not only more sweeping than anything contained in the agreements in those cases, but also must be interpreted in light of a record which reflects that the parties and the district court viewed the waiver as inclusive of attorneys' fees. [*Wakefield v. Mathews*, 852 *F*.2d 482, 484 (1988) (emphasis added).]

In this case there had been no attempt expressly to reserve the issue: the agreement recited "[A]ll claims for damages—actual, punitive and statutory of the Complaint and Counterclaim are hereby settled * * *." In addition, the filed stipulation of dismissal of the case contains no reference to any exclusion of the fees sought in the original complaint. We are satisfied that it would run counter to the fair expectations of counsel in the conduct of this case to have surmised that the public policy of New Jersey forbade such a settlement and dismissal of the action for statutory fees.

## IV.

We conclude then that in the circumstances of this case the statutory claims for attorney's fees of the client were encompassed within the negotiated settlement and stipulation of dismissal of the claims. In such future actions involving public-interest law firms defense counsel may not insist on the waiver or settlement of statutory fees as a condition of or before the settlement of the merits claim. Good practice and the ordinary candor expected between attorneys dictate that public-interest counsel make defendants and defense counsel aware of these conditions for settlement of any pending litigation. Public interest counsel shall disclose upon request the hourly fees and any claimed basis for fee enhancement.

The judgment of the Appellate Division is affirmed.

*For affirmance* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI, O'HERN and STEIN—7.

*For reversal* —None.