262 N.J. Super. 23 (1993)
619 A.2d 1024
PERFORMANCE LEASING CORP., PLAINTIFF-RESPONDENT,
v.
IRWIN LINCOLN-MERCURY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 30, 1992.
Decided February 2, 1993.
*24 Before Judges PETRELLA, LONG and D'ANNUNZIO.
Scott J. Basen argued the cause for appellant (Mehr & LaFrance, attorneys).
Douglas M. Calhoun argued the cause for respondent (Calhoun & Brady, attorneys).
The opinion of the court was delivered by LONG, J.A.D.
Defendant, Irwin Lincoln-Mercury, appeals from a judgment entered upon a jury verdict in favor of plaintiff, Performance Leasing Corp., in connection with the complaint plaintiff filed against defendant alleging, among other things, breach of contract, violation of the Consumer Fraud Act (N.J.S.A. 56:8-1 to -60), common law fraud and tortious interference with prospective economic advantage. Specifically, defendant contends that the trial judge erred in denying its motion for a new trial because the verdict was against the weight of the evidence; that the trial judge abused her discretion in awarding prejudgment interest; and that she erred in awarding counsel fees under the Consumer Fraud Act. We have carefully reviewed this record in light of these contentions and have concluded that an affirmance is in order.

I
Performance Leasing Corporation (plaintiff) is an automobile leasing company. Irwin Lincoln-Mercury, Inc. (defendant) is an automobile dealership. In 1987, plaintiff entered into a lease with a customer, Coated Sales, Inc., for a 1988 Lincoln Continental, *25 Signature Series with certain specified options. In December, 1987, plaintiff and defendant entered into an agreement under which plaintiff was to buy a new 1988 Lincoln Continental, Signature Series from defendant for $26,900 under a fleet-user arrangement with Ford Motor Company. This permitted plaintiff (a fleet-user) to buy a Ford automobile from a Ford franchise dealership (such as defendant) for $100 over the wholesale price charged by Ford to the dealership. In May, 1988, when Ford delivered the automobile to defendant, defendant refused to deliver it to plaintiff for the agreed-upon sale price.
Defendant claimed that plaintiff had only ordered a base-model 1988 Lincoln Continental, not the up-graded (and higher-priced) Signature Series. Before it would deliver the automobile to plaintiff, defendant demanded a sum in addition to the contract price. Plaintiff refused and, after settlement negotiations broke down, defendant sold the car to a retail buyer for $30,328.00. Plaintiff then filed this action. A jury found that the contract between the parties was as plaintiff had claimed and awarded plaintiff $12,500 in compensatory damages.
Plaintiff moved for an award of prejudgment interest and submitted a certification in support of counsel fees. Defendant opposed both applications and moved for a new trial, challenging the damage award but not the underlying liability finding. Although the record is silent on that issue, the trial judge apparently rejected defendant's new trial motion. On May 17, 1991, she entered an "order for judgment" against defendant "for the sum of $12,500.00, plus prejudgment interest in the sum of $2,587.33, plus attorneys fees in the sum of $6,000.00, plus costs of suit." Although defendant's notice of appeal indicates that it is from the judgment of May 17, 1991, because the motion for a new trial never addressed the underlying liability issue, (and as defendant conceded at oral argument) that issue is not cognizable on this appeal. R. 2:10-1. Battista v. Olson, 213 N.J. Super. 137, 516 A.2d 1117 (App.Div. 1986). *26 Thus, this appeal is limited to damages, prejudgment interest and counsel fees.

II
We turn first to defendant's challenge to the damages award. The facts adduced at trial relevant to this issue are as follows: Bruce Blum testified that he was plaintiff's president and also the executive vice-president of Performance B.M.W. According to Blum, Performance Leasing Corp. and Performance B.M.W. were affiliated corporations, in that they did business as a B.M.W. dealership together with a leasing company. Blum stated that, before plaintiff entered into its sale contract with defendant, it had entered into a "lease" with Coated for a 1988 Lincoln Continental (Signature Series) with certain additional options. Based upon plaintiff's purchase price of dealer's cost plus $100 (i.e., about $26,900), plaintiff contracted with Coated for a 48-month lease which, over the 48-month period, would yield plaintiff an anticipated profit of about $3,000.00.
Blum also indicated that, "at the end of the [48-month] lease," plaintiff anticipated the car would be worth $3,500 more than was owed to the bank which meant an additional profit of about $3,500 to plaintiff on the lease. In other words, Blum indicated that it anticipated earning a total profit of about $6,500 had the 48-month lease gone to completion.
Blum went on to testify that, after plaintiff's sales agreement with defendant "blew up" in May, 1988, plaintiff was not able to purchase the specified automobile with the options required by Coated from another Ford dealer because, in May, 1988, this was a "hot" car (i.e., a very desirable car at the time). In addition, no other Ford dealer would sell such a car (even if it had one in its then-present stock) at a fleet-user purchase price for immediate delivery. In other words, to purchase the same type of car that defendant was supposed to sell to plaintiff in May, 1988 for about $26,900, plaintiff would have *27 had to place another fleet-user purchase order with a different Ford dealer and then wait another five months for delivery.
Plaintiff searched for alternatives to satisfy Coated and, finally, persuaded Coated to accept a comparable substitute vehicle (a luxury car with the options Coated specified) which was a 1988 B.M.W. 735. According to Blum, in May, 1988, the demand for a 1988 B.M.W. 735 was also large and this model was in relatively short supply. Also, unlike Ford, B.M.W. had no fleet-user sale program and, as a result, plaintiff could not buy a 1988 B.M.W. 735 on any kind of a wholesale basis.
Therefore, plaintiff purchased a 1988 B.M.W. 735 from its affiliated corporation (Performance B.M.W.) for about $48,000, which was about $3,000 over the dealer cost to Performance B.M.W. of about $45,000. According to Blum, the prevailing retail price for a 1988 B.M.W. 735 was about $54,000. Thus, Blum indicated that, if Performance B.M.W. had sold the car to a retail customer instead of to plaintiff, Performance B.M.W. would have sold it for the prevailing market price which was about $54,000.
After purchasing the 1988 B.M.W. 735 from Performance B.M.W., plaintiff leased it to Coated under a 48-month lease. Blum testified that a profit of about $3,000 was built into that lease, but that, "in order to make the monthly [lease] payments come into line with what the Lincoln [lease] was," plaintiff "had to estimate ... the residual value" of the used B.M.W. "at the end of the lease" at an amount about $4,000 "more than what those estimates were." In other words, while the B.M.W. lease, on paper in May, 1988, had a built-in "profitability" of about $3,000 to plaintiff, it also carried the "potential to lose $4,000 at the end of that [48-month] lease." Therefore, instead of a profit of about $3,000 on the B.M.W. lease, plaintiff anticipated incurring a net loss of about $1,000 "over the whole term of the lease counting the residual value." Finally, Blum was asked about the effect of plaintiff's lease of the 1988 B.M.W. 735 to Coated upon Performance B.M.W. Blum replied that, by selling *28 the B.M.W. to plaintiff in May, 1988 for about $48,000, Performance B.M.W. was left with one less B.M.W. 735 which it could have sold to a retail customer for about $54,000. In other words, in 1988, Performance B.M.W. sold out its entire allocation of B.M.W. 735's and, therefore, it would have sold the B.M.W. 735 that it sold to plaintiff "one way or the other." Thus, Blum estimated that Performance B.M.W. lost a profit of about $6,000 in selling the B.M.W. 735 to plaintiff for about $48,000, instead of selling it to a retail customer for about $54,000.
In light of this testimony, plaintiff's attorney asked Blum this question: "And so is it fair to say that the inability to obtain this [Lincoln Continental] vehicle [from defendant] not only caused you to have the loss of the $6,500 profit that you would have had on the Lincoln lease [but] you lost another $1,000 ultimately on the B.M.W. lease and you lost another $6,000 on not having that one [B.M.W.] vehicle in your allocation ... ? ... So your total damages as a result of the failure [of defendant] to deliver this [Lincoln Continental] vehicle is $13,500?" To this question, Blum replied: "Yes."
On cross-examination, Blum noted that, in June or July of 1988 (i.e., about a month or two after plaintiff and Coated entered into the 48-month B.M.W. lease in May, 1988), Coated went into bankruptcy. As a result, in July, 1988, plaintiff repossessed the B.M.W. and re-leased it, as a used car, to a third party. Finally, at trial, Blum conceded that he had no proof indicating how much (if any) profit plaintiff had made upon its post-Coated-bankruptcy re-lease of the used B.M.W.
Defendant argues that on this evidence, the jury could not have reached the $12,500.00 damage figure. We disagree. In fact, the evidence of plaintiff's lost profits coupled with a portion of the cost plaintiff was required to incur as cover amply supported the jury verdict. R. 2:11-3(e)(1)(B). See 1 White & Summers, Uniform Commercial Code § 6-4 at 294-295 (3d ed. 1988). (The general principle behind 1-106, in the *29 case of a seller's breach of the sale contract, is to put the buyer in as good a position as if the seller had fully performed the contract, and no more); N.J.S.A. 12A:2-712(1) ("the buyer may `cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller"); N.J.S.A. 12A:2-712(2) ("The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (12A:2-715), but less expenses saved in consequence of the seller's breach"); N.J.S.A. 12A:2-715(2) ("Consequential damages resulting from the seller's breach include (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise ...") Given these standards and the evidence adduced at trial, it is clear that there is no warrant for our intervention as to the damages award which could have been reached on this record.

III
We turn next to defendant's challenge to the award of prejudgment interest. In support of this claim, defendant relies solely on our decision in Jardine Estates v. Donna Brook Corp., 42 N.J. Super. 332, 126 A.2d 372 (App.Div. 1956) for the proposition that "[prejudgment] interest should not be allowed where the damages are unliquidated and not capable of ascertainment by mere computation, or where a serious and substantial controversy exists as to the amount due under a contract...." Id. at 340-41, 126 A.2d 372. The problem with defendant's argument is that the Jardine rule has effectively been superseded.
In Busik v. Levine, 63 N.J. 351, 307 A.2d 571, appeal dismissed 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973), the Supreme Court stated that prejudgment "interest is payable *30 on a liquidated claim when liability is denied, even in good faith." 63 N.J. at 358, 307 A.2d 571. Likewise in Ellmex Constr. Co., Inc. v. Republic Ins. Co., 202 N.J. Super. 195, 494 A.2d 339 (App.Div. 1985), certif. den. 103 N.J. 453, 511 A.2d 639 (1986), we held that, in deciding whether to award prejudgment interest, the question "[w]hether the claim be liquidated or not is, under the Busik rationale, of no realistic importance." 202 N.J. Super. at 213, 494 A.2d 339. In circumstances where "the equities favor plaintiff," prejudgment interest "should be awarded." Ibid. Further, in Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 478, 541 A.2d 1063 (1988), the Supreme Court held that it was "settled that prejudgment interest may be awarded on contract claims" and, citing Ellmex, added that the "rule that limited prejudgment interest awards to cases where damages were liquidated or clearly ascertainable in advance has been significantly eroded." Ibid. Finally, in Swatek, Inc. v. North Star Graphics, Inc., 246 N.J. Super. 281, 587 A.2d 629 (App.Div. 1991), we recently stated that the "rule emerging from Ellmex is that prejudgment interest can be awarded whether either liquidated or unliquidated damages are recovered and the equities are in the injured party's favor." Id. at 288, 587 A.2d 629.
Thus, defendant's reliance on Jardine Estates as an absolute bar to the award of prejudgment interest in these circumstances is misplaced. No other argument having been advanced and there being nothing to warrant the conclusion that the award constituted an abuse of discretion, it is affirmed.

IV
We turn finally to defendant's contention that the trial judge was without power to award counsel fees pursuant to the Consumer Fraud Act. This argument is based upon the jury's responses to the verdict form:
 1. Did a contract exist between plaintiff Performance Leasing
 Corporation and defendant Irwin Lincoln Mercury?
 Yes X No ____ 6-0
*31 2. If you answered, "Yes" to Question No. 1, did defendant
 Irwin Lincoln Mercury breach the contract?
 Yes X No ____ 6-0
 3. If you answered "Yes" to Question No. 2, what amount
 of money would fairly and reasonably compensate plaintiff
 for its losses?
 $12,500 No ____ 6-0
 4. Did defendant Irwin Lincoln Mercury commit an unconscionable
 commercial practice in its dealing with plaintiff
 Performance Leasing Corporation?
 Yes X No ____ 5-1
 5. If you answered "Yes" to Question No. 4, what is the fair
 and reasonable amount of damages sustained by plaintiff
 Performance Leasing Corporation?
 $ 0 6-0
Defendant argues that the negative answer to question 5 precludes the assessment of counsel fees pursuant to the Consumer Fraud Act, which provides:
Any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act or the act hereby amended or supplemented may bring an action or assert a counterclaim therefor in any court of competent jurisdiction. In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit [N.J.S.A. 56:8-19].
As the verdict form reveals, while the jury found that defendant "committed an unconscionable commercial practice" (a "violation" of the Consumer Fraud Act), it also found that plaintiff sustained no damages as a result. Based on these facts and upon the decision in Martin v. American Appliance, 174 N.J. Super. 382, 416 A.2d 933 (Law Div. 1980), defendant *32 argues that, because the jury had awarded "no damages with reference to the unconscionable commercial practice," there "can be no statutory attorney's fees awarded." In Martin, a Law Division judge ruled that "a plaintiff who is the victim of consumer fraud but who sustains no ascertainable loss of moneys or property as a result thereof" has no entitlement to an award of reasonable attorneys' fees and reasonable costs of suit pursuant to N.J.S.A. 56:8-19. Id. at 383-86, 416 A.2d 933.
Subsequent to Martin, a number of cases have been decided which have undercut its continuing viability. In Skeer v. EMK Motors, Inc., 187 N.J. Super. 465, 455 A.2d 508 (App.Div. 1982), we noted that the Consumer Fraud Act contains two basic forms of remedy, the first requiring the intervention of the Attorney General and the second providing a private cause of action. Id. at 470, 455 A.2d 508. Because one reason behind the second remedy was "providing an incentive for an attorney to take a [consumer fraud] case and ... encouraging private parties to bring their own actions instead of turning to the Attorney General", we held that "it is highly likely that the Legislature intended to mandate payment of attorneys' fees and treble damages." Id. at 472, 455 A.2d 508:
When the two remedies are considered together, it makes sense to conclude that treble damages and attorneys' fees are mandated in a private action. If the Attorney General investigates and directs that the citizen be repaid, the citizen need not pay counsel fees and costs, having had access to the resources of the Attorney General's office. However, if citizens bring private actions, they will have to pay attorneys' fees and incur potentially considerable expense for a small recovery. [Id. at 470-71, 455 A.2d 508].
Having said this, we concluded with the statement that, "to the extent inconsistent with our ruling today, the recently reported case of Swiss v. Williams, 184 N.J. Super. 243, 445 A.2d 486 (Cty.D.Ct. 1982), is overruled." Id. 187 N.J. Super. at 473, 455 A.2d 508. (Swiss held the treble damages and attorneys fees provisions of the Consumer Fraud Act to be discretionary rather than mandatory). See also Huffmaster v. Robinson, 221 N.J. Super. 315, 319, 534 A.2d 435 (Law Div. 1986) ("assessment of treble damages and attorney's fees is mandatory when a violation of the Consumer Fraud Act has been proved."); *33 Wisser v. Kaufman Carpet Co., 188 N.J. Super. 574, 458 A.2d 119 (App.Div. 1983) ("appropriate attorney's fees under the [Consumer Fraud] Act may be allowed without regard to the amount involved in the underlying dispute.")
In Coleman v. Fiore Brothers, Inc., 113 N.J. 594, 552 A.2d 141 (1989), the Supreme Court noted that the fee-shifting provision in N.J.S.A. 56:8-19 advanced the Act's policy of ensuring that plaintiffs with bona fide claims are able to find lawyers to represent them and encouraging counsel to take on private cases involving an infringement of statutory rights. Id. at 598, 603, 552 A.2d 141. The Court also emphasized that N.J.S.A. 56:8-19 provides "that a successful claimant `shall' recover threefold damages plus [attorneys'] fees and costs." Id. at 598-99, 552 A.2d 141. Finally, the Court stated: "Although we have never held that the counsel fees and treble damages are mandatory under the Act, we have no doubt that there is a strong legislative policy in favor of fees both to make whole the victims of consumer fraud and to deter unconscionable practices." Id. at 599, n. 1, 552 A.2d 141.
Finally, in Chattin v. Cape May Greene, Inc., 243 N.J. Super. 590, 581 A.2d 91 (App.Div. 1990), aff'd o.b. 124 N.J. 520, 591 A.2d 943 (1991), we noted that N.J.S.A. 56:8-19 provides that successful plaintiffs shall be awarded reasonable attorneys' fees and reasonable costs of suit, and that "there is no requirement that an award of attorneys' fees be proportionate to damages." 243 N.J. Super. at 616, 581 A.2d 91.
In our opinion, this continuum of cases implicitly overrules the Law Division decision in Martin insofar as that decision held that a plaintiff who is the victim of consumer fraud but who sustains no ascertainable loss of moneys or property as a result thereof has no entitlement to reasonable attorneys' fees under N.J.S.A. 56:8-19. Martin, supra, 174 N.J. Super. at 383-86, 416 A.2d 933. Where, as here, a jury finds that a defendant has committed an unconscionable commercial practice as defined in the Consumer Fraud Act, no damages attributable to that practice need be found in order to *34 invoke the attorneys' fees provision of the Act. Thus, we approve, as entirely consonant with the Consumer Fraud Act, the award of reasonable attorneys' fees to plaintiff in this case.
Affirmed.