985 A.2d 1239

WILMAN PINTO AND ALVARO VASQUEZ, PLAINTIFFS–APPEL-
LANTS, v. SPECTRUM CHEMICALS AND LABORATORY
PRODUCTS AND SPECTRUM CHEMICAL MANUFACTURING
CORPORATION, DEFENDANTS–RESPONDENTS.

Argued October 13, 2009—Decided January 21, 2010.

582 

*Melville D. Miller, Jr.,* President, argued the cause for appellants (*Legal Services of New Jersey,* attorneys; *Mr. Miller, Ingrid D. Johnson, Stephanie E. Hosea, Sarah S. Hymowitz,* on the brief).

*Stacey D. Adams,* argued the cause for respondents (*Littler Mendelson,* attorneys; *Ms. Adams* and *Katy Shi–Klepper,* on the brief).

*Edward L. Barocas,* Legal Director, submitted a brief on behalf of amici curiae American Civil Liberties Union of New Jersey Foundation, John J. Gibbons Fellowship in Public Interest & Constitutional Law, Disability Rights New Jersey, Education Law Center, and New Jersey Appleseed Public Interest Law Center (*Mr. Barocas,* attorney; *Mr. Barocas,* of counsel; *Mr. Barocas* and *Michael A. Norwick,* on the brief).

Justice ALBIN delivered the opinion of the Court.

Parties to a lawsuit, generally, are free to negotiate the terms of a settlement in the way they see fit. The plaintiff, typically, will discount the maximum value of the case by factoring the probability of an unfavorable verdict and a low damages award. The defendant likely will accept a financial settlement that is worth the risk of averting an unfavorable judgment, a high monetary award, and protracted legal expenses. Settlement, as such, is a predictive science. Historically, without judicial interference, the parties

weigh the costs and benefits to determine whether a settlement is in their best interests.

We carved out an exception to that general policy in the case of public-interest lawyers representing clients in fee-shifting cases under the Consumer Fraud Act (CFA), *N.J.S.A.* 56:8–1 to –184. In *Coleman v. Fiore Bros.*, 113 *N.J.* 594, 552 *A.*2d 141 (1989), we addressed the conflict faced by a public-interest attorney who is compelled to negotiate the settlement of the value of her client's claim and, at the same time, the value of her counsel's fees as provided by statute. In that case, to protect a public-interest lawyer from being cast at odds with her client, we took a unique approach, barring "public interest counsel from simultaneous negotiation of statutory claims for fees until the merits of the claim have been settled and [ ] precluding defense counsel from attempting such simultaneous disposition." *Coleman, supra,* 113 *N.J.* at 605, 552 *A.*2d 141. We are now asked to revisit the soundness of that approach.

Legal Services of New Jersey (Legal Services) urges this Court to extend *Coleman's* rationale to other fee-shifting statutes, in particular cases arising under the Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19–1 to –14, and the New Jersey Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –49. Defendant in this case, along with an assortment of public-interest legal organizations, including the American Civil Liberties Union of New Jersey Foundation (ACLU), counters that *Coleman* should be limited to CFA cases. Indeed, having participated in the *Coleman* case, the ACLU confesses that the position it took twenty years ago was wrong and today professes that public-interest attorneys and their clients will be disadvantaged if they are precluded from simultaneously negotiating the settlement of the merits and counsel-fee claims in LAD and CEPA cases.

We now hold that *Coleman's* ban on simultaneous negotiations of merits and counsel-fee claims that applies to public-interest attorneys in CFA cases should not be extended to cases involving such fee-shifting statutes as the LAD and CEPA and should be

abandoned in CFA cases as well. We are convinced that permitting such simultaneous negotiations will not undermine the public policy of attracting competent counsel in state consumer fraud, discrimination, and whistleblowing cases and will, in fact, work to the benefit of public-interest lawyers and their clients, who will have a more realistic prospect of favorably settling their claims. However, in fee-shifting cases involving public-interest counsel, we will apply *Coleman's* injunction that "defense counsel may not insist on the waiver ... of statutory fees as a condition of ... settlement of the merits claim." *Id.* at 611, 552 *A.2d* 141. How a public-interest attorney and the client divide a lump-sum settlement is no business of the defendant.

## I.

### A.

Plaintiffs Wilman Pinto and Alvaro Vasquez worked as chemical packagers at a facility owned by defendant Spectrum Laboratory Products in New Brunswick, New Jersey until their termination in 2006.[1] Legal Services undertook the representation of plaintiffs and, in 2007, filed a civil action in the Superior Court, Law Division, claiming that defendant violated plaintiffs' rights under the CEPA and the LAD. The complaint also asserted common law claims against defendant for wrongful termination, breach of the implied covenant of good faith and fair dealing, and tortious interference with economic advantage.[2] Plaintiffs sought compensatory and punitive damages, civil penalties as prescribed by law, costs of suit, and attorneys' fees.

Plaintiffs allege that they were fired in retaliation for their repeated complaints about the dangerous working conditions in

---

[1] Spectrum Chemicals and Laboratory Products and Spectrum Chemical Manufacturing Corporation are collectively known by their legal name Spectrum Laboratory Products, Inc.

[2] The trial court later dismissed the tortious-interference claim

the chemical plant and the need for adequate protective gear. According to plaintiffs, they as well as other employees were compelled to package toxic chemicals with deficient safety equipment. As a result of exposure to toxic chemicals, plaintiff Pinto suffered diarrhea, vomiting, and a kidney ailment. Likewise, plaintiff Vasquez suffered vomiting, rashes, eye irritation, urinary tract infections, and stomach and breathing problems. Other employees endured serious chemical burns and other exposure-related injuries. Plaintiffs voiced their objections, and although defendant promised relief, ultimately nothing was done to address the plight of the workers at the chemical plant.

Plaintiffs also complained to defendant's representatives about the lack of staffing that resulted in unnecessary physical injuries, the lack of access to safety training and information, and the indifference and unresponsiveness in providing medical treatment for workplace injuries and illnesses. Another reason plaintiffs give for their termination was their efforts to unionize their disaffected co-workers. Additionally, plaintiffs allege that defendant discriminated against Hispanics on account of their ethnicity and "because they spoke Spanish." Last, plaintiffs aver that defendant trumped up charges of misconduct and unexcused absences as a pretext for their terminations.

Defendant denied all of the allegations in the complaint.

## B.

In August 2008, the parties entered into court-ordered mediation. Counsel for plaintiffs and defendant met separately with the mediator. The mediator apparently believed he had settled the case because he submitted to the trial court a completion-of-mediation form indicating, "Case Resolved." The parties, however, left the mediation process with entirely different understandings of the terms of the settlement, which was never reduced to writing.

In a letter to the Honorable Phillip L. Paley, J.S.C., Legal Services wrote that the mediator's "communication [of a settle-

ment] to the Court was premature." Legal Services submitted that the parties "reached a settlement on the dollar amount of the underlying claim *only*." Legal Services "declined to enter into any negotiations or discussions regarding attorneys' fees pursuant to [*Coleman*]."

In response, defendant's counsel wrote to Judge Paley that the monetary offer ($80,000) settled all financial claims against her client, including attorneys' fees. Counsel explained that she told Legal Services that piling on attorneys' fees was a "deal breaker." She further advised the court that her client would never agree to a settlement that did "not encompass, or even address, attorneys' fees."

In reply, Legal Services maintained that "plaintiffs advised defendant[ ] through the mediator that they could not discuss or negotiate attorneys' fees before reaching a settlement on the merits" because to do otherwise "would have been in violation of *Coleman*."

Plaintiffs filed a motion to enforce the settlement agreement, believing that attorneys' fees were excluded from it. Defendant sought to enforce the settlement agreement, believing that attorneys' fees were included within it. In denying both motions, Judge Paley found that the purported settlement was "unenforceable" because there was no "meeting of the minds." Judge Paley declined "to extend *Coleman* beyond its express terms," finding that case inapplicable outside of the consumer fraud context. The novelty of the issue—whether *Coleman* applied to LAD and CEPA claims—"suggest[ed] that the parties' negotiations were held under a mutual mistake." Accordingly, Judge Paley ordered the case to proceed to discovery and, if settlement could not be reached, to trial.

The Appellate Division denied Legal Services' motion for leave to appeal. Thereafter, a motion was filed with this Court, which granted leave to appeal. *Pinto v. Spectrum Chemicals*, 199 *N.J.* 124, 970 *A.*2d 1043 (2009). We also granted the motion of the ACLU, John J. Gibbons Fellowship in Public Interest & Constitu-

tional Law, Disability Rights New Jersey, Education Law Center, and New Jersey Appleseed Public Interest Law Center to participate as amici curiae.

## II.

The central issue raised by the parties in this case is whether the holding of *Coleman v. Fiore Bros.*, 113 *N.J.* 594, 552 *A.*2d 141 (1989) should be extended to LAD and CEPA cases. In deciding that issue, however, we must necessarily reexamine whether *Coleman's* basic rationale—barring public-interest lawyers from simultaneously negotiating settlement of claims for monetary damages and attorneys' fees—has continuing vitality in the context of CFA cases. We therefore begin with a review of *Coleman.*

*Coleman* involved a consumer-fraud action brought by four homeowners who claimed that the defendant induced them to purchase aluminum windows pursuant to unconscionable installment contracts. 113 *N.J.* at 607, 552 *A.*2d 141. Public-interest counsel (the Passaic Legal Aid Society) represented the homeowners and negotiated a settlement on their behalf. The terms of the settlement provided: "[A]ll claims for damages—actual, punitive and statutory, of the Complaint, and Counterclaim are hereby settled...." The settlement agreement made no direct mention of attorneys' fees. *Id.* at 607–08, 552 *A.*2d 141. After the settlement was signed, public-interest counsel sought attorneys' fees under CFA provision *N.J.S.A.* 56:8–19, which allows for the award of reasonable attorneys' fees to a consumer who suffers an "ascertainable loss." *Coleman, supra*, 113 *N.J.* at 607, 552 *A.*2d 141; *N.J.S.A.* 56:8–19. Counsel asserted that "she had been unable to conduct simultaneous negotiation of damages and attorney's fees due to an inherent conflict of interest that she perceived to exist between herself and her clients." *Coleman, supra*, 113 *N.J.* at 608, 552 *A.*2d 141.

In *Coleman*, we observed that the inherent "attorney-client conflict with respect to attorney fees is not unique to statutory-fee cases," *id.* at 601, 552 *A.*2d 141, but noted that the "[s]ettlement of

attorney's fees claims in [such] cases raises troublesome issues," *id.* at 599, 552 *A.*2d 141. We recognized that the fee-shifting provision of the CFA, like similar provisions in federal statutes, was "designed to attract competent counsel" to vindicate important statutory rights and "to ensure justice for all citizens." *Id.* at 598, 552 *A.*2d 141. We also distinguished public-interest attorneys from their private-practice counterparts because "public interest law firms have no right to receive compensation from their clients" and because the "policies of [those firms] preclude their allowing a claim for a statutory fee to interfere with an advantageous settlement." *Id.* at 603–04, 552 *A.*2d 141. To encourage public-interest lawyers to continue their mission of serving the needs of low-income citizens and to remove the ethical dilemma of having such lawyers sacrifice their statutory fees for the purpose of effectuating the best settlement for their clients, we carved out a special exception to the general policy of allowing the parties to freely negotiate the terms of a settlement. *Id.* at 602–05, 552 *A.*2d 141.

We concluded that, in all future CFA cases, public-interest attorneys could not engage in "simultaneous negotiation of statutory claims for fees until the merits of the claim have been settled," *id.* at 605, 552 *A.*2d 141, and that defense counsel would be barred from "insist[ing] on the waiver or settlement of statutory fees as a condition of or before the settlement of the merits claim," *id.* at 611, 552 *A.*2d 141.[3]

Significantly, in *Coleman,* we parted company with the position taken by the United States Supreme Court in *Evans v. Jeff D.,* 475 *U.S.* 717, 106 *S.Ct.* 1531, 89 *L.Ed.*2d 747 (1986). In that civil rights case, the Court held that a federal district court did not err in declining to reject a class-action settlement conditioned on plaintiffs' public-interest counsel waiving entitlement to attorneys' fees pursuant to the Civil Rights Attorney's Fees Awards Act, 42

---

[3] We did not apply this new rule to the facts of *Coleman* because we concluded that "the statutory claims for attorney's fees of the client were encompassed within the negotiated settlement and stipulation of dismissal of the claims." 113 *N.J.* at 611, 552 *A.*2d 141.

U.S.C. § 1988. *Id.* at 729–30, 106 *S.Ct.* at 1538, 89 *L.Ed.*2d at 759. In *Jeff D.,* a Legal Services attorney filed a class-action lawsuit on behalf of emotionally and handicapped children who were seeking improved medical treatment and education from the State of Idaho. More than two-and-one-half years later, defendants agreed to provide the injunctive relief for medical treatment that plaintiffs had originally requested—but only if plaintiffs' counsel would waive all claims for fees or costs.[4] *Id.* at 720–22, 106 *S.Ct.* at 1534–35, 89 *L.Ed.*2d at 753–54. Plaintiffs acceded to the settlement terms. Afterwards, public-interest counsel requested that the court not enforce the settlement provision requiring the waiver of attorneys' fees because it "exploited his ethical duty to his clients." *Id.* at 723, 106 *S.Ct.* at 1535, 89 *L.Ed.*2d at 755. The Supreme Court found that the settlement "expressly conditioned on waiver of statutory eligibility for attorney's fees" did not violate the fee-shifting provisions of 42 *U.S.C.* § 1988 in circumstances where the equitable relief provided in the settlement "equal[ed] or exceed[ed] the probable outcome at trial." *Id.* at 729–30, 743, 106 *S.Ct.* at 1538, 1545, 89 *L.Ed.*2d at 759, 767.

Justice Brennan dissented on the ground that allowing defendants to negotiate fee waivers that pit the client against counsel is not "consistent with Congress' goal of attracting competent counsel" in civil rights cases. *Id.* at 753, 758–59, 106 *S.Ct.* at 1550, 1553–54, 89 *L.Ed.*2d at 773, 777 (Brennan, J., dissenting). Justice Brennan reasoned that once public-interest lawyers calculate that there is a diminished likelihood of receiving legal fees for services rendered in civil rights cases, they will be less willing to undertake such cases. *Id.* at 754, 106 *S.Ct.* at 1551, 89 *L.Ed.*2d at 774. Significantly, Justice Brennan found that the simultaneous negotiation of merits and fee claims did not run afoul of 42 *U.S.C.* § 1988. *Id.* at 764–65, 106 *S.Ct.* at 1557, 89 *L.Ed.*2d at 781. He pragmatically accepted that defendants need to know the limits of

---

4 Early on in the litigation, Idaho agreed to settle the education claims—conditioned on counsel's waiver of fees. *Jeff D., supra,* 475 U.S. at 721–22, 106 S.Ct. at 1534–35, 89 *L.Ed.*2d at 754.

their liability when entering into a settlement. *Id.* at 762–64 & n. 17, 106 *S.Ct.* at 1555–56 & n. 17, 89 *L.Ed.*2d at 779–81 & n. 17.

The United States Supreme Court was "unanimous in concluding that the Fees Act [42 *U.S.C.* § 1988] should not be interpreted to prohibit all simultaneous negotiations of a defendant's liability on the merits and his liability for his opponent's attorney's fees." *Id.* at 738 n. 30, 106 S.Ct. at 1543 n. 30, 89 *L.Ed.*2d at 764 n. 30. Both the majority and the dissent in *Jeff D.* agreed that such simultaneous negotiations, even in fee-shifting cases, served the public interest of advancing the prospects of settlement. *Ibid.*

In distinguishing *Jeff D.* from *Coleman,* our Court explained that unlike the "civil-rights claims that might involve extensive injunctive relief for litigants," as in *Jeff D.*, "most consumer fraud claims will primarily provide monetary relief," as in *Coleman. Coleman, supra,* 113 *N.J.* at 601, 552 *A.2d* 141. We determined that following federal policies would disserve our State's interests. *See ibid.* It appears that, twenty years after *Coleman,* no other jurisdiction bars public-interest and defendants' lawyers from simultaneously negotiating settlements of both claims for damages and attorneys' fees in fee-shifting cases. *See* Paul D. Reingold, *Requiem for Section 1983,* 3 Duke J. Const. L. & Pub. Pol'y 1, 37 n. 129 (2008) (finding *Coleman* "[o]ne rare exception" in precluding sacrifice of attorneys' fees by mandating bifurcated negotiations).

## III.

### A.

Legal Services argues that *Coleman's* rationale applies to all fee-shifting statutes and urges that we require separate settlement negotiations on both the value of underlying claims and attorneys' fees in LAD and CEPA cases. Legal Services believes that this is necessary to vindicate the policy of attracting competent counsel in fee-shifting cases, reasoning that public-interest attorneys who are coerced to compromise their fees will have less

financial incentive or ability to service the State's many low-income residents who are victims of discrimination and retaliation for whistleblowing.

Defendant counters that expanding *Coleman* will impede settlements because a defendant seeking to resolve a case is looking for closure, not open-ended financial liability. In other words, a defendant will settle a case only when it understands the bottom-line. Therefore, extending *Coleman*, which blurs the bottom-line, will frustrate the potential for settlement and disserve the clients of public-interest law firms.

Six public-interest law firms, representing a broad array of experience with fee-shifting statutes in New Jersey, have entered the fray as amici, siding with defendant, not Legal Services. Amici challenge some of the basic assumptions underlying *Coleman*. Amici maintain that *Coleman* offers a bright-line distinction between public-interest and private-practice attorneys despite the common ethical dilemmas that both groups face when dealing with clients in fee-shifting cases. They note that both groups, on occasion, confront the pressure of having to reduce their fees to bring a settlement within reach, particularly in those cases where damages are low and attorneys' fees are high. Both public-interest and private attorneys, at times, will reduce their statutory fees to effectuate a settlement.

Amici argue that barring simultaneous negotiations will stifle settlements that benefit both their clients and the public at large.[5] They state that "[y]ears of real-world experience settling civil rights and LAD cases has taught [them] that defense counsel will seldom agree to enter into a settlement that does not resolve all outstanding issues, including fees." Amici suggest that the ban on simultaneous negotiations of claims and fees for the purpose of protecting public-interest lawyers is both unnecessary and counter-productive and that instead the profession must rely "upon

---

[5] Amici note that a settled case may transform public policy in a way that will positively impact the lives of countless people beyond the actual litigants.

faithful adherence to ethical codes in which loyalty to the client is paramount." Amici ask this Court *not* to interfere with the "settlement negotiation dynamics" in LAD and other civil rights cases that result in lump-sum settlements of both damages claims and attorneys' fees. Amici agree, however, that defendants should not be given authority to insist on a waiver of attorneys' fees. In other words, defendants should not be permitted to dictate the apportionment of settlement proceeds between public-interest attorneys and their clients.

### B.

The question is whether bifurcating settlement negotiations—compelling public interest attorneys and defendants to resolve the merits of a claim before discussing attorneys' fees—will best effectuate the goals that the Legislature sought to achieve by including fee-shifting provisions in the LAD, CEPA, and CFA.

Our Legislature has enacted fee-shifting provisions that allow attorneys' fees for the prevailing party in a number of statutory schemes, such as the LAD, *N.J.S.A.* 10:5–27.1, CEPA, *N.J.S.A.* 34:19–5, and the CFA, *N.J.S.A.* 56:8–19. *See Tarr v. Ciasulli*, 181 *N.J.* 70, 86–87, 853 *A.2d* 921 (2004) (setting forth standard for determining prevailing party status in LAD cases); *see also* 127 *N.J.L.J. Index* 340, 356–79 (Feb. 1991) (listing 201 mandatory and discretionary fee-shifting provisions). Fee-shifting provisions "are designed to attract competent counsel" to advance the public interest through private enforcement of statutory rights that the government alone cannot enforce. *See Coleman, supra,* 113 *N.J.* at 598, 552 *A.2d* 141. Those undertaking such cases serve as "private attorneys general," vindicating the rights of defrauded consumers, the victims of discrimination, and whistle-blowers who suffer retaliation for exposing wrongdoing. *See Jeff D., supra,* 475 *U.S.* at 745, 106 *S.Ct.* at 1547, 89 *L.Ed.2d* at 769 (Brennan, J., dissenting) (discussing role of fee awards in encouraging private attorneys to undertake federal civil rights cases).

This Court also has maintained a longstanding policy of encouraging the settlement of litigation on mutually acceptable terms to the parties. *Puder v. Buechel,* 183 *N.J.* 428, 437, 874 *A.2d* 534 (2005); *Ziegelheim v. Apollo,* 128 *N.J.* 250, 263, 607 *A.2d* 1298 (1992); *Nolan v. Lee Ho,* 120 *N.J.* 465, 471, 577 *A.2d* 143 (1990); *Judson v. Peoples Bank & Trust Co.,* 25 *N.J.* 17, 35, 134 *A.2d* 761 (1957). Settlements avert the risks of litigation, spare the parties ruinous litigation expenses, and conserve judicial resources. A defendant's likely settlement calculation is whether the payout is less than the "cost of the predicted judgment, discounted by its probability, plus the transaction costs of further litigation." *Jeff D., supra,* 475 *U.S.* at 734, 106 *S.Ct.* at 1541, 89 *L.Ed.*2d at 762. That formula leaves no room for the uncertainty of future-determined attorneys' fees. *Coleman* runs counter to the policy of promoting settlement negotiations on terms that will be acceptable to the parties.

We do not believe that judicially mandated bifurcated settlement negotiations have a practical application in the "real world" or advance the interests of the very people who are intended to be protected by such remedial statutes as the LAD, CEPA, and CFA. This case epitomizes the problem with *Coleman.* Defendant took the position that any monetary settlement that did not include a resolution of attorneys' fees and costs was a "deal breaker." A defendant needs to know its actual liability and will be reluctant to settle the merits of a LAD or CEPA case, or even a CFA case, when the plaintiff's legal fees are a multiple of the plaintiff's actual damages. It is hardly conceivable that a defendant would agree to pay a $25,000 damages claim knowing that it will have no room to negotiate the plaintiff's $200,000 legal bill. In such circumstances, in weighing the risks, a defendant will likely take its chances at trial. This prescription will lead to fewer settlements that will benefit plaintiffs in fee-shifting cases. The *Coleman* formula was intended to protect public-interest law firms and their clients, but, in reality, its application may do more harm than good.

To smooth the way for bifurcated negotiations, *Coleman* requires that, in advance of settlement of a merits claim, plaintiff's counsel provide to a defendant the attorneys' fees and costs that have accumulated. *Coleman, supra,* 113 *N.J.* at 611, 552 *A.*2d 141. Nevertheless, *Coleman* recognized that lawyers "may find it difficult to operate under [the bifurcated-negotiation] regime." *Id.* at 605, 552 *A.*2d 141. That has proved to be an accurate prediction.

At oral argument, Legal Services all but conceded that *Coleman's* constraints are not tolerable in the realm of settlement negotiations. Legal Services explained that, in settlement negotiations in CFA cases, it may make a "statement" expressing a willingness to voluntarily reduce lawyers' fees to help bring about a settlement. Yet, such fee discussions, even if initiated by Legal Services, appear to circumvent *Coleman's* explicit direction on the order of settlement negotiations—damages claims first, attorneys' fees later. We suspect that our regulation of the timing of negotiations is given lip-service when public-interest clients would not otherwise achieve prompt and just resolutions of their cases. *El Club Del Barrio, Inc. v. United Cmty. Corps.,* 735 *F.*2d 98, 101 n. 3 (3d Cir.1984) (recognizing that Third Circuit's then-existing ban on simultaneous negotiation of civil rights claims and attorneys' fees might have been "more honored in the breach"). The practical needs of both public-interest clients and defendants indicate that bifurcated negotiations do not advance the legislative goals of our fee-shifting statutes.

*Coleman* drew a distinction between public-interest and private counsel in CFA cases, finding that public-interest counsel faced unique conflict issues. However, the potential conflict between clients and their public-interest attorneys in fee-shifting cases is little different than the common dilemma facing private attorneys in both fee-shifting and other cases. The potential conflict may arise whenever a monetary settlement proposal is less than the full value of the client's purported damages and an attorney's reasonable fees. In a myriad of circumstances, the acceptance of a settlement by a client may adversely affect an attorney's fees.

For example, in a personal injury case in which the relationship between a client and her attorney is governed by a contingency-fee agreement that allows the attorney a percentage of the ultimate award, the client has the right to accept a settlement even though the attorney will not receive a full return on the time he has invested in the case. That is, the attorney cannot insist that the client risk a certain recovery achieved by settlement in the hopes of a higher recovery at trial, even though a success at trial might financially advantage the attorney. *See RPC* 1.2 ("A lawyer shall abide by a client's decision whether to settle a matter."). In such cases, when a defendant makes a settlement proposal, the value of the claim and the attendant attorney's fees are both on the table.

The same tensions between client and private counsel exist in fee-shifting cases, such as those arising under the Law Against Discrimination and Conscientious Employment Protection Acts. A defendant sued under one of those Acts customarily will offer a global settlement covering all monetary claims and attorneys' fees. The acceptance of the offer may not make both the client and attorney whole under their retainer agreement, and in such cases the client and attorney may have to compromise their claims to effectuate a settlement. Thus, private-practice and public-interest attorneys face the same attorney-client tension when the settlement offer does not satisfy all of the financial demands of both client and counsel.[6]

---

[6] Not all public-interest law firms are alike, a point missed in *Coleman*. Evidently, public-interest law firms, other than Legal Services, may enter into fee arrangements with their clients that permit a percentage of the recovery in accordance with court rules. Amici have indicated that public-interest law firms may enter into "a traditional contingency arrangement" when an action involves "substantial monetary damages" and require "for example, one-third of the lump sum as its attorneys' fees." From the representations of its counsel, Legal Services apparently cannot do the same. Legal Services can only represent low-income clients. Because Legal Services of New Jersey receives part of its funding through a federal grant program administered by Legal Services Corporation, 42 *U.S.C.* § 2996e(a)(1)(A), it has certain restrictions on its representation that do not apply to other public-interest law firms, *see* 42 *U.S.C.* § 2996a(3)

■ We trust that in these delicate situations attorneys will be attentive to their professional responsibilities, understanding that a client's interests must never be subordinated to the personal interests of the lawyer. *See RPC* 1.3 ("A lawyer shall act with reasonable diligence and promptness in representing a client."); *LoBiondo v. Schwartz,* 199 *N.J.* 62, 100, 970 *A.*2d 1007 (2009) (reaffirming longstanding principle that lawyers owe duty of zealous representation to clients). To the extent that lump-sum settlement offers present challenges to public-interest clients and their counsel on how to divide a limited pot between a client's damages and attorneys' fees, we believe that candid lawyer-client discussions about the value of the case from the outset will resolve many problems. For example, a CFA or LAD case that has a potential value of $50,000 in damages at the beginning of the case should not have a greater value because the lawyer has devoted $100,000 in time and out-of-pocket expenses. Public-interest as well as private-practice lawyers, in many cases, can protect themselves by frank disclosures in their retainer agreements or during the discovery process when the value of the claim becomes more crystallized.

*Coleman, supra,* stated that "private attorneys can arrange a fee agreement that would allow them to insist upon a statutory fee as part of any settlement." 113 *N.J.* at 603, 552 *A.*2d 141. But, public-interest law firms can do the same, as amici indicate in their brief. Indeed, Legal Services' retainer agreement with plaintiffs provides: "We have the right to collect attorney's fees from the adverse party, if they are recoverable." In the example given above, if the settlement offer is $75,000, surely a public-interest law firm can "insist" that $25,000 be allocated to attorneys' fees when the value of the client's claim is only $50,000.

■ We agree with defendant and amici that *Coleman's* ban on simultaneous negotiations of the value of claims and attorneys'

(defining "eligible client" as "any person financially unable to afford legal assistance").

fees should not be extended to LAD and CEPA cases. We also do not see any meaningful distinction between CFA cases and LAD and CEPA cases on the subject of barring simultaneous negotiations. Cases under the CFA, LAD, and CEPA all provide various remedies for the violation of statutory rights, including compensatory damages, equitable relief, and attorneys' fees. *See N.J.S.A.* 56:8–19(CFA); *N.J.S.A.* 10:5–13, –27.1(LAD); *N.J.S.A.* 34:19–5 (CEPA). *Coleman* suggested that CFA cases are different because many are of low monetary value. *Coleman, supra,* 113 *N.J.* at 603, 552 *A.*2d 141. However, there will be many CFA cases in which compensatory damages will be greater than in a LAD or CEPA case.[7] Therefore, we do not believe that *Coleman's* bar on simultaneous negotiations in CFA cases involving public-interest attorneys has continuing vitality.

 This Court has never hesitated to revisit one of its decisions when experience teaches that a rule of law has not achieved its intended result. To be sure, stare decisis—following precedent—provides stability and certainty to the law. Those governed by decisions of this Court must know that they can rely on our pronouncements. For that reason, we do not lightly alter one of our rulings. Stare decisis, however, is not an unyielding doctrine. Sometimes we learn that one of our decisions has consequences that were not fully anticipated. Stare decisis does not compel us to continue on a mistaken path or to "adhere blindly to rules that have lost their reason for being." *Fox v. Snow,* 6 *N.J.* 12, 23, 76 *A.*2d 877 (1950) (Vanderbilt, C.J., dissenting); *see, e.g., Olds v. Donnelly,* 150 *N.J.* 424, 440–43, 696 *A.*2d 633 (1997) (overruling *Circle Chevrolet Co. v. Giordano, Halleran & Ciesla,* 142 *N.J.* 280, 662 *A.*2d 509 (1995), because "[c]andor compels that we acknowledge that the application of the entire controversy doctrine to legal-malpractice claims has not fulfilled our expectations"); *White v. Twp. of North Bergen,* 77 *N.J.* 538, 552–54, 391

---

[7] The CFA, unlike the LAD or CEPA, provides for treble damages. *N.J.S.A.* 56:8–19.

*A.2d* 911 (1978) (reviewing civil and criminal cases where Court overturned prior decisions).

█ Like their private-counsel counterparts, public-interest attorneys must have the freedom to negotiate the terms of a settlement without undue restraints. Giving public-interest counsel and defendants the authority to simultaneously negotiate both the substantive claims and attorneys' fees is consistent with the Legislative aims of the CFA, LAD, and CEPA and the judicial policy of encouraging settlements. Thus, we lift that restraint placed on public-interest attorneys in *Coleman*.

## C.

█ On the other hand, *Coleman's* prohibition on a defendant conditioning settlement on the waiver of attorneys' fees has continuing validity in fee-shifting cases involving public-interest law firms. When a plaintiff is seeking monetary damages in fee-shifting cases, a defendant has no legitimate interest in how the plaintiff and attorney divvy up the settlement. In such circumstances, a defendant's demand that a plaintiff's attorney waive her statutory fee as the price of a settlement is not only an unwarranted intrusion into the attorney-client relationship, but a thinly disguised ploy to put a plaintiff's attorney at war with her client.[8] Plaintiffs' attorneys who are compelled to forfeit their hard-earned fees as a condition of settlement will be less inclined to take on the next case, and the cascading effect of that mindset will make it difficult to attract competent counsel to enforce the CFA, LAD, CEPA, and other fee-shifting statutes. As Justice Brennan noted in his dissent in *Jeff D.*:

> [O]nce fee waivers are permitted, defendants will seek them as a matter of course, since this is a logical way to minimize liability. Indeed, defense counsel would be remiss *not* to demand that the plaintiff waive statutory attorney's fees. A lawyer who proposes to have his client pay more than is necessary to end litigation has

---

[8] The same logic may apply to private-practice counsel and her client but the case before us involves only a public-interest law firm.

failed to fulfill his fundamental duty zealously to represent the best interests of his client.

[*Jeff D., supra,* 475 *U.S.* at 758, 106 *S.Ct.* at 1553, 89 *L.Ed.*2d at 777.]

We thus adopt the approach suggested by Justice Brennan in his dissent in *Jeff D.* and bar defendants from demanding fee waivers as a condition of settlement in fee-shifting cases involving public-interest law firms.

Moreover, this bar is equally justified when a defendant demands waiver of attorneys' fees as a condition of settlement in fee-shifting cases involving equitable relief. For example, a defendant public body, which has a statutory or constitutional obligation to perform a particular public duty, should not demand a waiver of attorneys' fees as a condition of performing that duty under the LAD or CEPA. Although defendants may not demand fee waivers, public-interest counsel may voluntarily compromise attorneys' fees, because equitable relief in many cases will have a substantial public benefit as well as financial value to the client. Public-interest counsel, however, after litigating a case for many long years should not be placed in the untenable position of being *required* to sacrifice all attorneys' fees for the sake of a settlement.

### D.

Last, we agree with the trial court that there was no settlement in this case because the parties never had a meeting of the minds on the precise terms of the agreement. Had the "settlement" been reduced to writing, the disparate positions of the parties would have become apparent. The parties acted in good faith, but under a mutual mistake about the true meaning of the settlement. Plaintiffs, hewing to the view that *Coleman* applied to LAD and CEPA cases, believed that the settlement only applied to the merits claim and did not preclude the right of Legal Services to petition the court for statutory attorneys' fees. Defendant believed that its offer encompassed a global resolution of all claims, including any right to attorneys' fees.

## IV.

In conclusion, we uphold the decision of the trial judge who found that the parties did not reach a settlement through the mediator. We also lift the bar that *Coleman* placed on public-interest attorneys and defendants from simultaneously negotiating merits and attorneys' fees claims in CFA cases. In the CEPA and LAD claims at issue in this case, and in future CFA cases, public-interest counsel may simultaneously negotiate merits and fees. Defendants, however, may not insist on a waiver of fees or dictate how settlement proceeds should be divided between a public-interest attorney and her client in a fee-shifting case.

We remand to the trial court for proceedings consistent with this opinion.

*For affirmance and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS—7.

*Opposed*—None.