43 A.3d 1188 (2012)
426 N.J. Super. 129
Catherine ZEHL, Plaintiff-Appellant,
v.
CITY OF ELIZABETH BOARD OF EDUCATION; City of Elizabeth Superintendent of Schools Pablo Muñoz (in his official capacity); The New Jersey Department of Education; The New Jersey State Board of Education; and The New Jersey State Commissioner of Education Lucille E. Davis (in her official capacity), Defendants-Respondents.
No. A-1296-11T3
Superior Court of New Jersey, Appellate Division.
Argued March 27, 2012.
Decided May 31, 2012.
*1189 Stephan T. Mashel, Freehold, argued the cause for appellant (Mashel Law, LLC, attorneys; Mr. Mashel, of counsel and on the brief).
John B. McCusker, Florham Park, argued the cause for respondents (McCusker Anselmi Rosen & Carvelli, PC, attorneys; Karen A. Murray, Shrewabury, and Marvin Lehman, Elizabeth, on the brief).
Before Judges BAXTER, MAVEN and CARCHMAN.
The opinion of the court was delivered by
CARCHMAN, J.A.D. (retired and temporarily assigned on recall).
This interlocutory appeal, where we review the propriety of the appointment of a discovery master based on extraordinary circumstances under Rule 4:41-1, requires us to reconcile and harmonize two significant policies: 1) the continuing need for and use of available tools and procedures to ensure that litigation is conducted in an orderly and efficient manner to achieve a *1190 just result; and 2) the recognition and safeguarding of unfettered judicial access for litigants prosecuting remedial actions brought pursuant to the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42, and the New Jersey Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8.
While these two policies generally partner well, where the posture of the litigation warrants the use of a discovery master, these policies may conflict. We conclude that in actions brought pursuant to the LAD and CEPA, in finding extraordinary circumstances as grounds for appointing a discovery master, the trial judge must consider the remedial nature of the LAD and CEPA litigation as well as the ability of litigants to absorb the costs of such relief. The judge must consider that the appointment of a discovery master in fee-shifting remedial cases, which by their very nature oftentimes involve litigants with limited resources, may impose a cost burden on litigants that creates a de facto bar to their access to the justice system. The trial judge failed to consider these factors here. Accordingly, we reverse and remand.

I.
We briefly summarize the alleged facts, as they provide a window into the tone and tenor of the litigation. Needless to say, these facts are sharply contested.
Plaintiff Catherine Zehl claims that she was wrongfully discharged from her position as a cook-manager for defendant City of Elizabeth Board of Education (the Board). In her CEPA claim, plaintiff alleges that: 1) Marvelis Perreira, a teacher at School No. 19, acted unlawfully, implicating student safety; and 2) pest infestation in the school kitchen at Board School No. 6 caused unsafe and unsanitary conditions. Plaintiff also asserts in her LAD claim that she suffered disability discrimination because she was discharged for her alleged occupational non-allergic asthma, which was caused by the pest infestation. Plaintiff filed an additional claim alleging worker's compensation retaliation.
Plaintiff was hired by the Board in December 1993 as a lunch aide. She received several promotions, most recently to the position of cook-manager at School No. 19. In November 2008, she observed that Perreira had left her classroom of fifth-grade students without supervision. Plaintiff monitored the children, and upon Perreira's return to the classroom, plaintiff returned to her work. In January 2009, plaintiff was called to the Board office, where Robert Stigliano, an investigating officer, questioned her about the Perreira incident. Apparently, the investigation was triggered by an anonymous letter to the superintendent that discussed plaintiff's observation that Perreira left her classroom unattended. Plaintiff was the only person who corroborated the allegation in the anonymous letter.
Perreira's husband, Paul Perreira, is or was a member of the Board. Perreira is a cousin of Carlos Trujillo, who is or was President of the Board. Perreira has a close personal relationship with former Board President Rafael Fajardo. Plaintiff asserts that because of these various relationships, Perreira avoided discipline for her misconduct. Plaintiff further claims that her own subsequent discharge derived from her having reported Perreira's behavior.
Four days after plaintiff's interview with Stigliano, plaintiff was transferred to School No. 6. Plaintiff alleges that schools such as School No. 6, that are located in high-crime areas and are in poor physical condition, are places to which the Board routinely sends employees who have fallen out of favor with the administration. According *1191 to plaintiff, the kitchen and stockroom of School No. 6 were infested with mice, gnats and cockroaches, and rodent feces littered both rooms. By February 2009, plaintiff developed a severe allergy to mice feces, for which she received medical treatment.
In the spring of 2009, plaintiff received a positive performance evaluation from Margaret Reese, her supervisor at School No. 6. Plaintiff asked for and received a transfer to School No. 14 in April 2009.
On May 6, 2009, Jaime Leavitt, the Supervisor of Food Services for the Elizabeth School District, recommended that plaintiff be "non-renewed." Thereafter, plaintiff was asked to sign a disciplinary warning notice Leavitt had prepared, which acknowledged that plaintiff had failed to report to an employee, Glenda Harris, that plaintiff had been absent because of illness. Plaintiff also received a poor evaluation from Leavitt for her performance at School No. 19. One month later, plaintiff was informed that her employment contract with the Board would not be renewed, and she was told to clean out her desk immediately.
This litigation followed, and discovery was pursued in earnest. We need not expand on the magnitude of discovery in this case, but so far, it has involved a significant number of interrogatories, including many parts and subparts, followed by motions for more specific answers as to at least seventy-one interrogatories and subparts. This has spawned a motion involving twenty-two interrogatories and subparts, document demands, and depositions of teachers as well as members of the school board, which, in turn, prompted numerous telephone calls to the judge for immediate rulings, applications for protective orders, motions to quash subpoenas, together with extensive motion practice to enforce discovery orders, impose sanctions, compel additional discovery and review documents in camera, as well as the usual motion practice attendant to any actively contested litigation.
Various discovery and case management orders were entered, and in June 2011, the then-trial judge signed an order appointing a discovery master. The judge noted that a discovery master was warranted because of "the overall rancor and contentious nature in which discovery has proceeded to date." That order was subsequently vacated, and the trial judge recused himself from further participation in the litigation.
What followed were a case management order and another series of contentious discovery motions. Again, we need not detail the motions, except to note that they demonstrated the parties' need for significant judicial intervention and assistance to proceed with discovery. The new trial judge responded to this situation by appointing a new discovery master. Plaintiff unsuccessfully opposed the appointment. In appointing the discovery master, the judge found extraordinary circumstances and set forth the following reasons for his decision:
(1) this county is currently reduced to four judges sitting in the civil division and one is assigned to the special civil court;
(2) regular motion practice in this case has required an expenditure of time and effort unparalleled in this judge's almost 27 years on the bench;
(3) i.e.[,] on this motion day alone, this court has had to address 140 motions: It had 20 motions for oral argument, the instant motion[,] however, consumed almost 50% of bench time required by all motions;
(4) the attorneys['] apparent difficulty in comprehending or accepting orders of [the judges] has resulted in baseless motions for reconsideration as well as arguments *1192 with the court over rulings after they have been made;
(5) all of this is an unfortunate and needless expenditure of time;
(6) interruptions of daily activities and trial by telephone calls over disputes arising at depositions;
(7) repetition and revisiting of prior motions, rulings, etc.
(8) the case itself is not a "run of the mill matter" but one involving serious allegations that may have violated three fairly complex statutes and may have ramifications not just limited to the parties sub judice.

In his order, the judge granted the discovery master[1] the authority to "address and resolve" all discovery disputes, motions and claims for relief, including the authority to enter orders. The judge fixed the discovery master's compensation at "his usual and customary rate not to exceed $450 an hour"[2] and then provided that "each party shall be responsible for one[-] half share of all statements" submitted by the discovery master. Finally, the judge ordered that all "statements, interim or otherwise shall be satisfied within ten days of receipt, and it will be the personal responsibility of each attorney if the client fails to comply with this Order."
Plaintiff filed an application for leave to file an interlocutory appeal. We granted the motion,[3] and this appeal followed.
On appeal, plaintiff argues that there were no extraordinary circumstances warranting the appointment. While plaintiff ascribes the difficulties in discovery practice to defendants' conduct, we need not determine fault. It is readily apparent that both parties have engaged in discovery and other pretrial conduct that tests the limits of judicial resources and patience.

II.
Our analysis of the issues presented requires us to first examine the enabling provision of the Rules of Court. The relevant portions of Rule 4:41 provide:

Rule 4:41-1. Reference
The reference for the hearing of a matter by a judge of the Superior Court shall be made to a master only upon approval by the Assignment Judge, and then only when all parties consent or under extraordinary circumstances. The order of reference shall state whether the reference is consensual and, if not, shall recite the extraordinary circumstances justifying the reference.

Rule 4:41-2. Compensation
The master's compensation shall be fixed by the court and charged upon such of the parties or paid out of any fund or property as the court directs. The master is entitled to a writ of execution against a party failing to comply with an order for compensation.
The Rule, the application of which is subject to the discretion of the court, describes two circumstances permitting the appointment of a discovery master: when the parties consent or when extraordinary circumstances exist. Plaintiff challenges *1193 the appointment here and questions the judge's finding of extraordinary circumstances; however, distilled to its essence, plaintiff's argument focuses on the cost of a discovery master and the impact of such cost on plaintiff's ability to maintain this litigation. This argument has merit.
We identify the intersection of the two policies implicated by this appeal. As we described at the outset, the causes of action pursued here involve remedial legislation, reflecting the public policy objective to "ensure justice for all citizens." Pinto v. Spectrum Chems. & Lab. Prods., 200 N.J. 580, 589, 985 A.2d 1239 (2010) (citing Coleman v. Fiore Bros., Inc., 113 N.J. 594, 598, 552 A.2d 141 (1989)). See also Donelson v. DuPont Chambers Works, 206 N.J. 243, 256, 20 A.3d 384 (2011) (noting the remedial nature of CEPA); Quinlan v. Curtiss-Wright Corp., 204 N.J. 239, 268, 8 A.3d 209 (2010) (observing the same about the LAD). The remedial nature of the statutes is enhanced by provisions that allow shifting of attorney's fees for successful plaintiffs. These provisions were "designed to attract competent counsel" in order to vindicate plaintiffs' important statutory rights. Pinto, supra, 200 N.J. at 589, 985 A.2d 1239.
We also recognize that the judiciary has more than a significant stake in ensuring that it is able to operate in a manner and under circumstances to meet the same policy objective for which remedial legislation strives, that is, to ensure justice for all litigants.
Often, the interest in alleviating administrative burdens harmonizes with litigants' interest in swift and economical resolution of their disputes. To achieve the end of conserving judicial resources, we have, in the past, recognized the appointment of a discovery master as an appropriate method to fulfill this objective. See Shanley & Fisher, P.C. v. Sisselman, 215 N.J.Super. 200, 203, 521 A.2d 872 (App. Div.1987) (reviewing litigation that involved "voluminous exhibits" as well as parties who were family members and business partners where a discovery master had been appointed); see also Levine v. Wiss & Co., 97 N.J. 242, 250, 478 A.2d 397 (1984) (citing Barcon Assocs., Inc. v. Tri-County Asphalt Corp., 86 N.J. 179, 210, 430 A.2d 214 (1981) (Clifford, J., dissenting), for the principle that one of the public policy concerns favoring arbitration is the fact that this dispute resolution mechanism "relieves our overburdened judicial resources"). For example, In re Unanue, 311 N.J.Super. 589, 710 A.2d 1036 (App.Div.), certif. denied, 157 N.J. 541, 724 A.2d 801 (1998), cert. denied, 526 U.S. 1051, 119 S.Ct. 1357, 143 L.Ed.2d 518 (1999), involved the disposition of the estate of a wealthy businessman who had resided and conducted business in several foreign countries as well as jurisdictions throughout the United States. We affirmed the trial judge's decision to appoint a discovery master to determine the sole issue of the quantum of counsel fees incurred by the plaintiff, finding extraordinary circumstances because of "the years of litigation instigated by defendant in a plethora of courts and jurisdictions [which] resulted in massive documentation and [because] of the substantial fees incurred by plaintiffs. The sheer volume of the material rendered the issue particularly suitable to review and recommendation by a master." Id. at 598, 710 A.2d 1036.
The judge here focused primarily on the burdens on the judiciary caused by the parties' litigation strategies but did not address the public policy of ensuring the parties' access to the judicial system. Indeed, in his statement of reasons, the judge identified the limited judicial resources available in the vicinage, noting the dearth of judges available to address civil matters. Plaintiff counters that this cited reason cannot be deemed an "extraordinary *1194 circumstance," and she further contends that she should not bear the costs of a discovery master when she is not responsible for the fact that the judiciary is understaffed.
We recognize the pressures on judges and staff when judicial resources are limited and their case loads increase. Some cases, especially those involving litigants with appropriate resources, are amenable to the use of discovery masters.[4] Yet, weighing the judicial interest against the policy considerations underlying remedial litigation, particularly as embodied in the statutory allocation of the financial burdens among litigants in LAD and CEPA cases, the interest in conserving judicial resources must yield. Indeed, in LAD and CEPA cases, the Legislature has defined a policy to ensure that litigants may vindicate the significant protected rights addressed by these legislative remedies.
We make similar observations regarding the judge's reference to the extensive motion practice in this case, which included motions for reconsideration as well as telephonic objections raised during depositions, all of which certainly imposed on the judge's time. The motions were numerous to the point of excessive, but such conduct cannot be countered by delegating motions to discovery masters without regard for the consequent financial burden to litigants, whose interests are protected by the LAD and CEPA.
Moreover, the judge's comments about motion practice implicate due process concerns. The Due Process Clause of the Fourteenth Amendment guarantees citizens access to courts to present claims of wrongdoing. U.S. Const. amend. XIV, § 1; Wolff v. McDonnell, 418 U.S. 539, 578-79, 94 S.Ct. 2963, 2985-86, 41 L.Ed.2d 935, 963-64 (1974). In a different context, we concluded that "the complete denial of the filing of a claim without judicial review of its merits would violate the constitutional right to access [to] the courts[.]" Rosenblum v. Borough of Closter, 333 N.J.Super. 385, 390, 755 A.2d 1184 (App. Div.2000) (citing U.S. Const. amend. XIV, § 1). Yet, as we observed in Parish v. Parish, 412 N.J.Super. 39, 48-49, 988 A.2d 1180 (App.Div.2010), courts have the inherent authority, if not the obligation, to control the filing of frivolous motions and to curtail "harassing and vexatious litigation." Rosenblum, supra, 333 N.J.Super. at 387, 391, 755 A.2d 1184. In Rosenblum, we examined whether a pro se litigant could be enjoined from filing successive complaints after the court had previously concluded the claimed relief was frivolous. Id. at 387, 755 A.2d 1184. We held that in certain circumstances, due process is not impaired by enjoining litigation. Id. at 391, 755 A.2d 1184. "[W]here a pattern of frivolous litigation can be demonstrated, the Assignment Judge can prevent the complaint from being filed[,]" when other available sanctions, such as monetary penalties, have proved unsuccessful as deterrents. Id. at 391-92, 755 A.2d 1184. See also N.J.S.A. 2A:15-59.1(b)(1), and R. 1:4-8(a)(1)(addressing frivolous pleadings and appropriate remedies).
However, in D'Amore v. D'Amore, 186 N.J.Super. 525, 453 A.2d 251 (App.Div. 1982), we cautioned that any exercise of the court's power to prospectively enjoin harassing litigation must not impinge on "the fundamental right of the public to access [] the courts in order to secure *1195 adjudication of claims on their merits." Id. at 530, 453 A.2d 251. In Parish, we rejected a judicial restraint that barred the plaintiff from seeking enforcement of a recently entered judgment unless he first affirmatively attempted resolution of the dispute because, in the absence of any finding of a need to control baseless litigation, the balance struck by the motion judge in favor of restricting access to the court was an abuse of discretion. Supra, 412 N.J.Super. at 51, 988 A.2d 1180.
Ultimately, the public policy evinced in remedial litigation must be at the forefront of any decision regarding the appointment of and apportionment of costs for a discovery master. The judge here made little mention of the nature of the case, except for a reference to complex statutes.[5] Legal complexity may be a factor, but it is not dispositive. The policy of advancing remedial litigation, however, may be dispositive; at a minimum, that policy must be considered in the appointment of a discovery master. No such consideration was afforded here.
Issues of access and undue financial burdens require a tempering of the use of extraordinary management techniques such as the appointment of a discovery master. The due process and dispute resolution concerns cause us to counsel the bench and the bar to utilize available tools and in-house resources to maintain and manage a case that can be viewed as "out of control." Case management techniques such as case management conferences, motion screening procedures and other similar methods are available to address the frustrations that ensue from litigation of this tenor. The judge alluded to the inordinate amount of time devoted to the motions. To the extent that the parties sought oral argument on these motions, the Rules authorize judges to limit the right to oral argument on motions that address discovery or the calendar, see Rule 1:6-2(c), and even if requested, the granting of oral argument is subject to the court's discretion.
Judges retain the inherent authority to impose reasonable conditions on motion practice to allow for appropriate case management and the efficient and effective administration of the case. In Parish, supra, 412 N.J.Super. at 50, 52, 988 A.2d 1180, although we rejected a judicially imposed requirement that the parties engage in a "four-way" conference before filing motions, we did so, in part, because the judge's requirement delayed rather than expedited the resolution of contentious litigation. However, we endorsed the principle that "a court may properly require parties to attempt to narrow their differences," id. at 55, 988 A.2d 1180, by means of specific codified case management methods, id. at 56-57, 988 A.2d 1180.
In addition to due process concerns, the public policy of promoting access to courts cannot be thwarted by cost. The cost of a discovery master must be factored into any appointment decision.[6] The judge here ordered an equal division of such cost. The record is devoid of any consideration of the effect of this cost on plaintiff's ability to litigate the case. Plaintiff is a cook who was employed by a school board. To suggest that at this juncture of *1196 the case she be burdened with a cost of hundreds of dollars per hour is unrealistic. We also note that defendant is a public entity, and potentially tax payers will assume the cost of the discovery master. This, too, is a factor for the trial judge to consider.
We recognize that plaintiff might not ultimately bear the cost of the discovery master since if she is successful, under the statutory fee shifting provisions, the trial judge may shift that financial burden to defendant. Yet, even with the possibility of belated adjustments, litigants in LAD and CEPA cases would be wary about pursuing their claims if they were exposed to the potential of significant costs incurred in the litigation. The cost of a discovery master directly affects "access" to the judicial remedies available to accommodate critical remedial legislation.
Cases abound that are time-consuming, contentious beyond reason, and a significant drain on both judicial time and resources. The use of a discovery master is an important tool in a judge's management "tool kit," but its use must be sparing, as the appointment of a discovery master is by definition an extraordinary event. Indeed, it represents the court's ceding of a modicum of judicial authority over and responsibility for the resolution of disputes between litigants. In establishing the high threshold of "extraordinary circumstances" and imposing a check on such appointments by requiring the imprimatur of the assignment judge, the Court intended such appointment to be the exception rather than the rule. There are instances where its use is appropriate. We envision that, in protracted cases involving voluminous documents and complex legal issues and in complex litigation involving scores of depositions, interrogatories and other discovery techniques, courts may have limited time and resources to engage in the requisite review and analysis without the assistance of masters. Despite this recognition, we caution that appointments be judicious and limited. We decline to further define the parameters of the circumstances prompting the need for such appointments.
We have no disagreement with the concerns the judge expressed in his order. Diminishing judicial resources, coupled with an increase in more complex litigation, places enormous pressures on trial judges, especially those facing expanding motion lists that must be resolved in a timely and thoughtful manner. Yet, increasing burdens on judges and the court system are not the focal points of the extraordinary circumstances analysis envisioned by the Rules. As a general rule, the circumstances to be evaluated must be "case-centric" rather than systemic.
The judge's order contravenes the public policy goals of the LAD and CEPA, which contain fee-shifting provisions to reward "[t]hose undertaking cases ... vindicating the rights of ... the victims of discrimination and whistleblowers who suffer retaliation for exposing wrongdoing." Pinto, supra, 200 N.J. at 593, 985 A.2d 1239. The order appointing a discovery master in this case cannot stand.
We reverse and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] Three appointments were made, including two retired judges, one now deceased, as well as a practicing attorney. All three appointees were highly skilled and respected members of the bench and bar and were capable of resolving the discovery issues in this case.
[2] The original order appointing a discovery master provided a mechanism for reallocation of fees.
[3] Plaintiff's motion for leave to appeal the September 8, 2011 order appointing a discovery master was granted; plaintiff's motion to review the merits of certain discovery orders was denied. A stay was granted as to the use of a discovery master, but in all other respects, discovery was to continue in the trial court.
[4] We recognize that the judiciary has established myriad alternative dispute resolution programs such as those that mandate participation in mediation and arbitration; we further note, however, that the enabling rules and regulation of such programs are carefully crafted to impose a minimal cost obligation to litigants.
[5] We question the "legal complexity" of the issues presented. We recognize that LAD and CEPA cases can present challenging fact patterns and legal questions, but our review of the limited record before us does not convince us that the issues presented here are more complex than the issues generally attendant to LAD and CEPA cases.
[6] We exclude from this consideration, "consent" cases. We also recognize that there are LAD and CEPA cases where not only will cost be an irrelevant consideration, but also the nature of the parties and other relevant factors will support the appointment of a discovery master. See, e.g., a class action LAD or CEPA case.