# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1377-25

IN THE MATTER OF ROMAN
CATHOLIC ARCHDIOCESE OF
NEWARK SEXUAL ABUSE
LITIGATION.

_____

Argued May 12, 2026 – Decided June 15, 2026

Before Judges Sumners, Chase and Augostini.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-8762-19.

Patrick Papalia argued the cause for appellant Seton Hall University (Archer & Greiner, PC, attorneys; Patrick Papalia and Christian A. Steuben, on the briefs).

Gabriel C. Magee argued the cause for respondent Jeffrey McCloskey (Baldante & Rubenstein, PC, Nagel Rice LLP, and Gregory Gianforcaro, attorneys; John W. Baldante, Gabriel C. Magee, Jeffrey Anderson (Jeff Anderson & Associates, PA), Trusha Goffe (Jeff Anderson & Associates, PA), Gregory Gianforcaro and Bradley L. Rice, of counsel and on the brief).

PER CURIAM

On December 24, 2025, we stayed a Law Division discovery order and granted appellant Seton Hall University's ("SHU") request to take an interlocutory appeal. R. 2:2-4. We affirm in part and vacate and remand in part.

I.

This matter is a consolidated action of approximately 450 cases filed in the wake of the Child Victims Act ("CVA"), S. 477/A. 3648 (2018), L. 2019, c. 120, § 2, 9-10, which permitted victims of childhood sexual assault to bring a civil lawsuit against their abusers until their fifty-fifth birthday. These specific actions seek damages against the Roman Catholic Archdiocese of Newark and associated Parishes, Churches, Schools, and Entities ("RCAN"). One related entity is SHU, a separately named defendant in five of these actions based on the conduct of Theodore McCarrick.

McCarrick was a Catholic bishop and cardinal who served as the Archbishop of Newark from 1986 to 2000. In 2017, an allegation of sexual misconduct was made against McCarrick, prompting investigations by the Vatican and various institutions that he was associated with.

In 2018, the New York Times reported that McCarrick had been removed from the ministry because he sexually abused a minor while a priest in New York.

A-1377-25

In July 2018, the Washington Post published an article with the headline "Cardinal Theodore McCarrick is the target of new allegations of sexual misconduct." The article described four new allegations against McCarrick, in addition to the older credible allegation. According to the Washington Post, Reverend Boniface Ramsey joined SHU's faculty in the 1980s and heard reports from seminarians at SHU's Immaculate Conception Seminary ("ICS") of McCarrick's inappropriate behavior.

McCarrick was previously the Chair of the Board of Trustees ("the Trustees") and the President of the Board of Regents ("the Board") at SHU and maintained a residence on the campus. In July 2018, SHU also received an email from a former seminarian who alleged that McCarrick had inappropriately touched him.

As a result of those complaints and having been aware that the CVA was pending in the legislature, SHU's Office of General Counsel was worried about potential liability. Therefore, SHU retained the law firm of Gibbons P.C. ("Gibbons"). Gibbons then retained the law firm Latham & Watkins LLP ("Latham") to conduct an independent investigation into the matter so it could better advise SHU.

The Board's Executive committee received regular updates from Latham and advice from Gibbons as the investigation continued. On August 21, 2019,

3

Gibbons provided SHU with a legal memorandum containing legal advice and the expected findings of Latham's investigation. The following week, Gibbons, Latham, and the Board held a confidential meeting to discuss the factual findings of the investigation and for Gibbons to provide legal advice.

As a result, the Board unanimously passed a resolution and report "to address the misconduct of the individuals involved" uncovered in Latham's investigation. The report stated that the investigation was complete and had "found that McCarrick created a culture of fear and intimidation that supported his personal objectives. McCarrick used his position of power as then-Archbishop of Newark to sexually harass seminarians. No minors or other University students were determined to have been affected by McCarrick." See Seton Hall Univ., Seminary Review Update (Aug. 2019), https://www.shu.edu/news/seminary-review-update.html ("Seminary Review").

On September 6, 2019, Latham provided Gibbons with its investigatory report (the "Latham Report") and labelled it as privileged and confidential work product. Disclosure of the report was placed under heavy restrictions. To read the Latham Report, members of the Board had to make an appointment, turn over their cell phone, sign what was essentially a non-disclosure agreement, and enter a designated reading room alone. No screenshots or copies of the report were permitted, and members were not allowed to discuss its contents unless in

4

Executive Session or as required by law. On September 18, 2019, Gibbons provided updated advice to SHU based on the Latham Report.

Meanwhile, the Vatican was conducting a wider independent investigation into McCarrick's alleged misconduct and requested SHU provide it with the Latham Report. SHU believed Catholic Canon laws required it to comply. As such, SHU provided the report, and the Vatican agreed that it would remain confidential.

During this time, Pope Francis had requested McCarrick's resignation from the College of Cardinals. In 2019, after the Congregation for the Doctrine of the Faith had found him culpable of acts of adultery, contrary to the Sixth Commandment, McCarrick was convicted of sexual misconduct by the Church and laicized. McCarrick passed away in April 2025.

The Vatican published its investigatory findings in a 2020 report. Sec. of State of the Holy, Report on the Holy See's Institutional Knowledge and Decision-Making Related to Former Cardinal Theodore Edgar McCarrick (1930 to 2017) (2020), https://www.vatican.va/resources/resources_rapporto-card mccarrick_20201110_en.pdf ("Vatican Report"). In its published report, the Vatican noted that the Latham Report "remains confidential but was made available to the Holy See," and it disclosed that the Latham Report "found no evidence that McCarrick made sexual advances while in bed with seminarians

A-1377-25

or engaged in sexual contact with anyone on the campus of [SHU]." Vatican Report, at 457-58. It found that even though SHU knew about McCarrick sharing a bed with seminarians, "no action was taken to curb the practice at the time, in part because it was understood to be non-sexual and consensual." Vatican Report, at 446-47.

In September 2020, the Law Division consolidated all cases against RCAN for case management and discovery purposes and appointed plaintiffs' litigation counsel ("PLC") to act as the class representative for plaintiffs. Thereafter, various case management orders were entered concerning discovery. In September 2022, the court granted the PLC's motion to compel discovery. RCAN then moved for leave to file an interlocutory appeal, which we denied.

In December 2024, Politico published a story detailing that Msgr. Joseph Reilly had been elevated to president of SHU, even though he had been implicated in the sexual abuse scandal related to McCarrick. This article detailed a "secretive internal investigation that concluded that Reilly knew of sexual abuse allegations and that he did not report." It noted that Seton Hall hired Gibbons and Latham to review McCarrick's "influence and actions" at the university during his years leading the Newark archdiocese.

As a result of the story, PLC sent a discovery deficiency letter to SHU requesting all documents related to the investigation into McCarrick and the

culture of fear and intimidation at SHU. The PLC noted there was no privilege log provided. After receiving no response, the PLC requested a case management conference. In February 2025, the court did so. Following the case management conference, the court entered an order compelling SHU to either produce the Latham Report and "other related documents, including any memos and correspondences, in unredacted and redacted versions" to the court or move for a protective order. SHU opted for the latter and pursuant to <u>Rule</u> 4:10-3 moved for a protective order.

In March 2025, the court ordered SHU to turn over an unredacted version of the Latham Report, related memorandum, correspondences, and documents, along with a privilege log, for an in-camera review. In addition, the Order required the Bates stamping of documents and that SHU was required to provide the PLC with a privilege log identifying the documents submitted to the court and the asserted privilege. SHU submitted nearly 3,500 documents containing 20,000 pages for the in-camera review. SHU's privilege log contains different categories of documents. Broadly speaking, the privilege log contained: (1) emails; (2) email attachments; and (3) loose documents (referred to as "electronic files"). The emails include emails between (1) Gibbons and Latham (not SHU), (2) Gibbons and SHU (not Latham), (3) Gibbons, Latham and SHU, and (4) Latham's communications with third parties during the investigation.

Many "electronic files" represent either scans of printed documents SHU emailed to Gibbons upon the latter's request, or Word documents prepared by Latham or Gibbons during Gibbons' engagement by SHU. Some of the attached documents were created prior to the retention of Gibbons.

On November 12, 2025, the court found no privilege or protections applied to most of the documents. The court concluded that the attorney-client privilege shielded only the very narrow category of emails among all three entities: SHU, Latham and Gibbons. The court also found the work product doctrine only shielded disclosure of "any conclusions made by Latham" contained in the Latham Report. Thus, the court ordered SHU to produce: the Latham Report with Latham's conclusions redacted; all emails with attachments that did not include SHU, Gibbons, and Latham on the email chain; and all attachments that were created/maintained by SHU during the investigation, including all documents and electronic files that pre-dated the start of the investigation. We granted SHU motion for leave to appeal as to the Latham Report and associated documents, including witness-interview notes, and legal memoranda prepared by Gibbons.

II.

We review the court's discovery decision employing an abuse of discretion standard. C.A. ex rel. Applegrad v. Bentolila, 219 N.J. 449, 459 (2014). "We

8

generally defer to a trial court's disposition of discovery matters unless the court has abused its discretion or its determination is based on a mistaken understanding of the applicable law." Rivers v. LSC P'ship, 378 N.J. Super. 68, 80 (App. Div. 2005). An abuse of discretion "arises when a decision 'is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. I.N.S., 779 F.2d 1260, 1265 (7th Cir.1985)).

However, issues regarding questions of law are decided de novo. Barlyn v. Dow, 436 N.J. Super. 161, 170 (App. Div. 2014). The applicability of the attorney-client privilege is a legal question and thus subject to a de novo review. Comprehensive Neurosurgical, P.C. v. Valley Hosp., 257 N.J. 33, 79-80 (2024) (citing Hedden v. Kean Univ., 434 N.J. Super. 1, 10 (App. Div. 2013)). So is the application of the work product doctrine because it is codified in a court rule. R. 4:10-2; see also Hansen v. Rite Aid Corp., 253 N.J. 191, 212 (2023) ("A trial court's interpretation of a court rule is a determination of law which this Court reviews de novo" (quoting Occhifinto v. Olivo Constr. Co., LLC, 221 N.J. 443, 453 (2015))).

A-1377-25

## III.

### A.

We are persuaded by SHU's contention that the court erred when it found that no attorney-client relationship existed between it and Latham through Gibbons.

"Communication between a lawyer and his client in the course of that relationship and in professional confidence, are privileged," and the client alone holds the right to waive this privilege. N.J.R.E. 504(1); N.J.S.A. 2A:84A-20. This relationship between an attorney and his client "is the oldest privilege known to common law." Halbach v. Boyman, 369 N.J. Super. 323, 328 (App. Div. 2004) (citing Upjohn Co. v. United States, 449 U.S. 383, 389 (1981)). As Justice Pashman aptly noted, "[i]f the rule of law is the nation's secular faith, then the members of the Bar are its ministers." State v. Sugar, 84 N.J. 1, 12 (1980). "The root of the attorney-client privilege is the recognition that 'sound legal advice or advocacy serves public ends' and requires full and frank communication between a client and his counsel." Halbach, 369 N.J. Super. at 328 (quoting Dontzin v. Myer, 301 N.J. Super. 501, 506 (App. Div. 1997)).

"[T]he privilege regarding confidential communications between an attorney and client 'extends to the necessary intermediaries and agents through whom the communications are made.'" State v. Davis, 116 N.J. 341, 361 (1989)

10

(quoting State v. Kociolek, 23 N.J. 400, 413 (1957)). An investigator "who may act as an agent of either the defendant or his counsel[] renders services on behalf of the defendant." Id. at 362. Thus, confidential disclosures are privileged even though they are made through a "necessary intermediary" rather than the attorney. In re Subpoena Duces Tecum on Custodian of Recs., Crim. Div. Manager, 420 N.J. Super. 182, 186 (App. Div. 2011) (quoting Davis, 116 N.J. at 361), aff'd 214 N.J. 147 (2013); see also State v. Pavin, 202 N.J. Super. 255, 262 (App. Div. 1985) (finding privilege only applies between insured and an adjuster if the communication is made "for the dominant purpose of the defense of the insured by the attorney and where confidentiality is the reasonable expectation of the insured").

So long as the communication is made "to aid the attorney in giving legal advice to his client or to prepare for litigation, then the privilege applies." Hannan v. St. Joseph's Hosp. & Med. Ctr., 318 N.J. Super. 22, 27 (App. Div. 1999) (citing Payton v. N.J. Tpk. Auth., 148 N.J. 524, 551 (1997)). The attorney-client privilege applies to notes, communications, and other documents if they are "prepared at the behest of and for" counsel. See Macey v. Rollins Env't Servs. (N.J.), Inc., 179 N.J. Super. 535, 540 (App. Div. 1981) (holding statements prepared by a corporate agent at the request of the corporation's general counsel were protected by attorney-client privilege); Hannan, 318 N.J.

11

Super. at 27-28 (finding a summary and chronology of events prepared by a plaintiff at his attorney's request was protected by attorney-client privilege).

However, the attorney-client privilege "is neither absolute nor sacrosanct." Hedden, 434 N.J. Super. at 11-12 (citing Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 1 on N.J.R.E. 504(3)). Because privilege is used to exclude evidence, it "runs counter to the fundamental theory of our judicial system that the fullest disclosure of the facts will be best lead to the truth and ultimately to the triumph of justice." Horon Holding Corp. v. McKenzie, 341 N.J. Super. 117, 124 (App. Div. 2001) (quoting In re Selser, 15 N.J. 393, 405 (1954)). "The attorney-client privilege is not restricted to legal advice, though '[t]he privilege is limited to those situations in which lawful legal advice is the object of the relationship.'" Rivard v. Am. Home Prods, Inc., 391 N.J. Super. 129, 154 (App. Div. 2007) (alteration in original) (quoting In re Grand Jury Subpoena on Gonnella, 238 N.J. Super. 509, 512 (Law Div. 1989)).

The Court in Payton distinguished "an attorney who provides legal services or advice to an organization and one who performs essentially nonlegal duties." 148 N.J. at 550. The attorney-client privilege is inapplicable where an attorney conducts an investigation, "not for the purpose of preparing for litigation or providing legal advice, but rather for some other purpose." Id. at 551. The Payton Court declined to apply either an absolute or qualified privilege

12

to a "self-critical analysis" investigation and report, and it instead believed "case-by-case balancing is much more appropriate in accommodating self-critical analysis than is a per se privilege." Id. at 545, 547-48. This balancing test recognizes that "certain interests in disclosure are strong enough, in their reflection of important public policies, to outweigh such confidentiality concerns under most, if not all, circumstances." Id. at 548 (citing, among others, CPC Int'l v. Hartford Accident & Indem. Co., 262 N.J. Super. 191, 195-204 (Law Div. 1992)). The Court believed that in claims of great public interest, such as the eradication of discrimination and sexual harassment, "the balance will favor disclosure" but allowed for "adequate protective measures to ensure maximal confidentiality given the necessity of disclosure." Id. at 549-50.

Our Court has also held that the privilege may be pierced under extremely limited circumstances. In Kozlov, the Court established a three-part test which a party must satisfy to pierce the privilege; privileged material may be disclosed where: (1) there is "a legitimate need . . . to reach the evidence sought to be shielded"; (2) the evidence must be relevant and material to an issue in the case; and (3) there is a finding, "by a fair preponderance of the evidence," that the information sought cannot be obtained from a "less intrusive source." In re Kozlov, 79 N.J. 232, 243-44 (1979) (quoting In re Farber, 78 N.J. 259, 276-77 (1978)). The first prong of Kozlov is met "only in the most narrow of

13

circumstances, such as where a privilege is in conflict with a defendant's right to a constitutionally guaranteed fair trial." State v. Mauti, 208 N.J. 519, 538 (2012). Otherwise, Kozlov would "relegate [the attorney-client privilege] to the status of a pedestrian discovery dispute." Dontzin, 301 N.J. Super. at 508. The piercing test must only be applied in "circumstances so grave . . . that the privilege must yield to the most fundamental values of our justice system." Ibid. (alteration in original) (quoting In re Nackson, 114 N.J. 527, 532 (1989)).

The court concluded that there was no attorney-client relationship between Latham and SHU because Latham explicitly wrote in its report that "Gibbons (and not [SHU]) was Latham's client in this matter[,] that [SHU] has never been a Latham client, and that Latham will not represent [SHU] in any matter related to these allegations." However, this is not dispositive. There is undoubtedly an attorney-client relationship between Gibbons and SHU, and the court's analysis failed to consider that Latham was acting as an agent of Gibbons when it conducted the investigation. As Davis, 116 N.J. at 361, makes clear, an investigator acting on behalf of counsel renders service on behalf of that counsel's client. Even though no attorney-client relationship existed between SHU and Latham, an attorney-client relationship existed between Gibbons and SHU that extended to Latham as a necessary agent of Gibbons. The attorney-

A-1377-25

client privilege would then apply if the relationship was for giving legal advice or preparing for litigation.

## B.

We next move to SHU's assertion that the work-product privilege applies to the documents. Moreover, SHU argues that the court erred because it made conclusory findings that plaintiff had shown substantial need and undue hardship compelling the production of the work-product documents. We agree.

The work-product doctrine is an exception to "New Jersey's general policy of encouraging full and open discovery of all relevant information." Paladino v. Auletto Enters., Inc., 459 N.J. Super. 365, 370 (App. Div. 2019). The doctrine was first recognized in Hickman v. Taylor, 329 U.S. 495, 498-99 (1947), where a retained lawyer interviewed survivors of a boat accident and prepared a report based on his notes of the interviews. The Court found that the interview notes, private memoranda, and personal recollections "fall[] outside the arena of discovery and contravenes the public policy underlying the orderly prosecution and defense of legal claims. Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney." Id. at 510. The Court believed an attorney's ideas, beliefs, and mental impressions should be "inviolate" and that to compel their disclosure would result in "[i]nefficiency, unfairness and sharp practices" that would ill serve the

15

interests of the clients and the cause of justice. <u>Id.</u> at 511. Hence, the work-product doctrine recognizes the need for lawyers to "work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." <u>O'Boyle v. Borough of Longport</u>, 218 N.J. 168, 189 (2014).

New Jersey codified the work-product doctrine in <u>Rule</u> 4:10-2(c), which provides that:

> a party may obtain discovery of documents, electronically stored information, and tangible things otherwise discoverable . . . and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including an attorney, consultant, surety, indemnitor, insurer or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the case and is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

Determining whether the work-product doctrine applies to each document requires "a case-by-case, fact-specific analysis." <u>Paladino</u>, 459 N.J. Super. at 374 (citing <u>Carbis Sales, Inc. v. Eisenberg</u>, 397 N.J. Super. 64, 81-82 (App. Div. 2007)). "The first inquiry is whether the materials were prepared in anticipation of litigation or trial by another party or that party's representative." <u>Ibid.</u>, <u>See</u>

also <u>Tractenberg v. Township of West Orange</u>, 416 N.J. Super. 354, 374 (App. Div. 2010). A document may be prepared in anticipation of litigation before litigation is commenced or even threatened. <u>Miller v. J.B. Hunt Transport, Inc.</u>, 339 N.J. Super. 144, 149 (App. Div. 2001) (citing, among others, <u>Martin v. Bally's Park Place Hotel & Casino</u>, 983 F.2d 1252, 1260-61 (3d Cir. 1992)). There must, however, "have been an objectively reasonable basis for anticipation of litigation." <u>Ibid.</u> (citing 8 <u>Wright & Miller's Federal Practice & Procedure</u> § 2024 at 343 (2d ed. 1994)). If the materials were prepared in anticipation of litigation, the party seeking the materials must then show a substantial need for their production and that he or she is unable, without undue hardship, to obtain the substantial equivalent of those materials. <u>Paladino</u>, 459 N.J. Super. at 374-75 (citing <u>R.</u> 4:10-2(c)).

"The first prong is always satisfied when the discovery sought is a statement of another party or a witness, as the prior statement is extremely helpful in cross-examining a witness." <u>Medford v. Duggan</u>, 323 N.J. Super. 127, 137 (App. Div. 1999). The second prong, however, is harder to show, since "the person who gave the statement may always be deposed. Moreover, the deposition may often constitute the substantial equivalent of the prior statement." <u>Ibid.</u> Accordingly, any documents produced in anticipation of litigation, which there is a substantial need for their production, and that plaintiff

17

is without undue hardship able to acquire are protected by the work-product doctrine.

C.

The PLC argues that even if a privilege did apply, that privilege was waived when SHU provided the documents to the Vatican. They posit there is no meaningful and material connection between the Vatican and SHU and argue that by providing allegedly privileged documents to the Holy See, SHU has waived any privilege. We are not persuaded.

When attorney-client privilege applies, it "is ordinarily waived when a confidential communication between an attorney and a client is revealed to a third party." O'Boyle, 218 N.J. at 186 (citing Stengart v. Loving Care Agency, Inc., 201 N.J. 300, 323 (2010)). However, when third-party "disclosure of confidential attorney-client communications is necessary to advance the representation, disclosure will not waive the privilege." Ibid. (citing Rawlings v. Police Dep't of Jersey City, 133 N.J. 182, 196 (1993)); Kociolek, 23 N.J. at 413.

In addition to the advancement of representation, there exists a "'common interest' doctrine which protects communications made to a non-party who shares the client's interests." In re State Comm'n of Investigation Subpoena No. 5441, 226 N.J. Super. 461, 466 (App. Div. 1988) (citing United States v. Zolin,

18

809 F.2d 1411, 1417 (9th Cir. 1987), aff'd in part and vacated in part, 491 U.S. 554 (1989)).  Where "two entities are formally interrelated" and one was "created at the insistence of" the other, and "[t]he operations of the entities are at least closely intertwined," one may share privileged information, such as a report and communications made by an attorney retained to conduct investigations, render legal advice, and make recommendations without waiving privilege.  Id. at 467-68.

In 2001, we found guidance from federal case law on this matter:

> The common interest exception may be asserted with respect to communications among counsel for different parties if "(1) the disclosure is made due to actual or anticipated litigation; (2) for the purposes of furthering a common interest; and (3) the disclosure is made in a manner not inconsistent with maintaining confidentiality against adverse parties."
>
> [Laporta v. Gloucester Cnty. Bd. of Chosen Freeholders, 340 N.J. Super. 254, 262 (App. Div. 2001) (quoting Holland v. Island Creek Corp., 855 F. Supp. 4, 6 (D.D.C. 1995)).]

The court in Laporta also found that it was not necessary for every party's interest to be identical, so long as they "have a 'common purpose.'"  Ibid. (quoting United States v. McPartlin, 595 F.2d 1321, 1336 (7th Cir. 1979)).  The court found that "when such privileged information is turned over to a non-adversary who has a legitimate interest in the information, . . . there is no waiver

A-1377-25

unless it can be shown that there was a 'conscious disregard' of the possibility that an adversary would gain access to the material." Ibid. (citing In re John Doe, 662 F.2d 1073, 1081 (4th Cir. 1981)).

In 2014, Pope Francis sought "[t]he effective protection of minors and a commitment to ensure their human and spiritual development," and created the Commission for the Protection of Minors to find "the most opportune initiatives for protecting minors and vulnerable adults, in order that we do everything possible to ensure that crimes such as those which have occurred are no longer repeated in the Church." Pope Francis, Chirograph of His Holiness Pope Francis for the Institution of a Pontifical Commission for the Protection of Minors (2014). The Holy See's position on the issue of sexual abuse of minors by clerics was emphasized again in 2019, when the Pope declared that "while gravely affecting our societies as a whole, this evil is in no way less monstrous when it takes place within the Church." Pope Francis, Address of His Holiness Pope Francis at the End of the Eucharist Concelebration (February 24, 2019), https://www.vatican.va/content/francesco/en/speeches/2019/february/documents/papa-francesco_20190224_incontro-protezioneminori-chiusura.html.

Notably, at the time, the Vatican was investigating the allegations against McCarrick on the orders of the Pope and published the Vatican Report the following year. The Vatican Report made clear that the materials, including

20

documents, interviews, and testimony "were gathered for the sole purpose of contributing to this Report and are not authorized for any other use." The Vatican Report at 2. It further noted that the Latham Report "remains confidential but was made available to the Holy See." Id. at 446.

Both the Vatican and SHU shared a common interest in investigating McCarrick, namely the shared goal of not having someone credibly accused of sexual misconduct and abuse as part of their staff or clergy. There was no "conscious disregard" that the Vatican might make the Latham Report available to the public, as both parties had agreed to keep the report confidential. The information provided to the public through the Vatican Report was not new, as it repeated only the information that had been made public by the victims of abuse and by appellant's own published statements.

ICS makes clear that as a part of the Catholic community, it is "obedient to the Magisterium." Seton Hall Univ., Immaculate Conception Seminary School of Theology, Our Mission (Dec. 11, 2023), https://www.shu.edu/theology/mission.html. As such, when the Vatican requested ICS and SHU provide the Latham Report to assist in an investigation ordered by the Pope, it was not simply a question of local public policy but a "canonical governance question" that SHU believed "went to [its] essential Catholic identity and mission." As a part of the Church, SHU provided the

21

Vatican with the Latham Report as part of its religious duty and in furtherance of their shared goal of investigating the extent of McCarrick's abuse and preventing the abuse from happening to others. Thus, SHU did not waive any privilege by Sharing the Latham Report to the Vatican.[1]

IV.

Applying these principles, we turn to an analysis of the disputed documents. We consider in turn the Latham report, the legal memoranda, investigative reports, and the emails and attachments that were the subject of the court's order.

The Latham Report

The court ordered that the Latham Report be turned over to PLC but allowed for the redaction of any conclusions or opinions. The court further found that even if there was an attorney-client relationship between SHU and Latham, plaintiffs had shown a legitimate need for the report sufficient to pierce the privilege. We disagree.

Gibbons was retained in 2018, before the CVA was passed, which expanded the statute of limitations for victims of childhood abuse to file claims,

---

[1] Because it is not necessary for our determination of whether a privilege applies, we do not address the issue of whether the Latham Report and associated documents should have been included on a privilege log.

went into effect. However, the introduction of the CVA to the Legislature in January 2018 was no secret, just as the allegations against McCarrick were no secret. Amidst the multiple allegations against McCarrick, a reasonably prudent entity like SHU would investigate its own potential liability, considering the seriousness of the allegations against McCarrick, his high position in the Church, and the length of time he was involved with ICS. This would have been doubly true when considering the media coverage McCarrick and the allegations against him had garnered.

Gibbons had been retained "to commission an independent review of McCarrick's influence and actions at the Seminary." See Seminary Review. Gibbons then retained Latham. The Latham Report lists three main issues their investigation focused on: (1) if there was any evidence to substantiate the complaints against McCarrick; (2) whether and how SHU responded to any complaints regarding McCarrick's misconduct; and (3) whether SHU's policies and protocols were consistent with federal law and best practices. The first two issues are consistent with anticipation of litigation, namely finding evidence to either substantiate or disprove any potential claims and providing the background for a potential negligence defense and subject to another exception are privileged.

23

Plaintiff has not met the requirements under <u>Kozlov</u> for an exception to warrant a piercing of the privilege. Under the test outlined in <u>Kozlov</u> the first "need" prong is not fulfilled as the present matter does not involve "the most narrow of circumstances," such as a defendant's right to a constitutionally guaranteed fair trial. <u>Mauti</u>, 208 N.J. at 538. Moreover, although the Latham Report may be relevant and material to the issues in the case, plaintiff has not established the remaining elements of the <u>Kozlov</u> test.[2] The trial court found plaintiffs had demonstrated a "substantial need" for the Latham Report because they were "unable without undue hardship to obtain the substantial equivalent of the materials by other means." This vague and speculative statement does not meet the high threshold required under <u>Mauti</u> to pierce the privilege.

In contrast to the first two sections of the Latham Report, the third section, "University Sexual Harassment Policies," is clearly a self-critical analysis that "examined whether the University's historical and current policies satisfy Title IX" and if and how they would have applied to the McCarrick allegations. This part was not prepared in anticipation of litigation since it was used to amend and improve SHU's practices. As in <u>Payton</u>, the public interests, namely eradicating

---

[2] The Latham Report itself does not answer questions about the identity of witnesses because it identifies them in general terms such as "Priest 2," "ICS Seminarian 5," or "Instructor 1." The Latham Report only names witnesses whose allegations were already made public.

24

sexual harassment and abuse as well as increasing transparency at SHU and in the Church, weigh strongly in favor of disclosure of this part. The chilling effect that would discourage witnesses from answering interviews and surveys truthfully is minimal, since the Latham Report does not disclose any names, and the survey of fifty-nine seminarians was conducted anonymously. Thus, it is in the public interest to disclose self-critical analyses of SHU's policies and procedures. Accordingly, the third section of the Latham Report, and documents relating to it, should be produced.

The court's order regarding SHU to turn over the Latham report is vacated as to the first two sections. Because there are some materials that may cover both the investigation into McCarrick and the self-critical analysis, on remand, the court shall determine whether some documents may require redactions before they are produced to PLC. It is likely some interviews with seminarians, staff, or clergy covered both the accusations against McCarrick and the interviewee's knowledge of SHU's policies and procedures; the former should be redacted while the latter should not. The court's previous order allowing for the redaction of mental impressions and conclusions, regardless of which investigation they fell under, is affirmed.

<u>Legal Memoranda</u>

In considering the twenty-three legal memoranda and attorney notes prepared by Gibbons for SHU, SHU argues that the court erred by not addressing the memoranda separately in its opinion and instead including it under "electronic files" subject to discovery. SHU notes that the court did not find any exception to the attorney-client privilege, even though the court found that the attorney-client relationship existed. We agree.

As with the full Latham Report, the documents prepared in anticipation of litigation in relation to the McCarrick investigation are protected by attorney client privilege, as they were used to assist Gibbons in rendering legal advice to SHU. See <u>Paff v. Div. of Law</u>, 412 N.J. Super. 140, 154 (App. Div. 2010) (noting that "it is beyond dispute that the attorney-client privilege applies whenever confidential legal advice is rendered to [the client]"). They are also protected under the work-product doctrine. On remand, the court shall determine specifically if each of these documents were prepared in anticipation of litigation or if they concerned the self-critical analysis portion of the investigation. The latter shall be produced.

<u>Latham Investigation Notes</u>

There are approximately ninety Latham witness interview notes. These documents all appear on the privilege log as "electronic files," and were ordered

A-1377-25

to be turned over to PLC. In its decision and order, the court did not specifically address these documents. On remand, the court must determine if either the attorney-client or work product privilege applies to each note and whether there is a self-critical analysis portion, which should be produced. See Seacoast Builders Corp. v. Rutgers, 358 N.J. Super. 524, 542 (App. Div. 2003) (quoting Payton, 148 N.J. at 550) ("When a New Jersey trial court reviews documents in camera, it must 'make specific determinations regarding plaintiff's access to them, including an expression of reasons for the court's rulings.'").

Emails

The bulk of the approximately 3,500 documents consist of emails. SHU asks us to consider the large volume of emails and their attachments, noting that they are related to the Latham Report. See Hedden, 434 N.J. Super. at 11 (noting the attorney-client privilege extends to "an e-mail communication between attorney and client during the course of a professional relationship and in confidence") (internal citation omitted); Seacoast, 358 N.J. Super. at 554 (noting an email from client to its law firm was "obviously protected by the attorney-client privilege as a communication with counsel in the course of a professional relationship and in confidence").

SHU argues that there are emails between it and Gibbons, with no third-party communications, in which Gibbons provides legal advice to SHU based

on the Latham investigation that are clearly protected by attorney-client privilege. SHU also notes that there are approximately 972 emails between Latham and Gibbons regarding the investigation and that the emails are protected by attorney-client privilege because they were only created due to SHU's retention of Gibbons. Likewise, SHU argues, the emails between only SHU and Latham are protected since Latham is an extension of the Gibbons-SHU relationship. We are persuaded by these arguments.

The court found that email communications between Gibbons, SHU, and Latham were protected by attorney-client privilege because there was a clear attorney-client relationship between Gibbons and SHU, and this extended to communications with Latham. However, the court misapplied its discretion in finding that any emails between Latham and SHU, where Gibbons was not copied, or Gibbons and SHU, where Latham was not copied, were not protected. On remand, a fact-specific analysis needs to be completed to determine whether each email was prepared in anticipation of litigation. Moreover, the court must determine if the documents contain self-critical analysis, in which case that part should be produced.

SHU also contends that e-mails between SHU, Latham or Gibbons, and third parties should be protected because they are the work product of Latham's investigation. The court noted that many of these emails had attachments that

28

"predated this investigation" and went back to the 1980's.  The court reasoned that to apply privilege to documents simply because they were attached to an attorney-client communication would cause otherwise discoverable material to escape disclosure.  We agree with the court that applying the privilege to documents created before the retention of Gibbons simply because they were attached to an attorney-client communication would cause otherwise discoverable material to escape disclosure.  Thus, on remand, an individual assessment needs to be completed of each email to determine whether a privilege applies.  Additionally, SHU should have the opportunity to contest whether any of these attached pre-retention documents have a stand-alone privilege precluding disclosure.[3]

---

[3]  We note that in a recently published opinion we held that where an investigation predates the initiation of an action, a "sufficiently close temporal nexus between the claims, the undertaking of the investigation, and the filing of the complaint" can be evidence that an attorney was acting as both an investigator and a legal advisor and that a document was prepared in anticipation of litigation.  See C.S. v. Brick Recycling Co., ___ N.J. Super. ___, ___ (App. Div. June 1, 2026) (slip op. at 17).  We remain convinced that the Latham Report was prepared in anticipation of litigation given Seton Hall's concerns regarding the pending CVA.  Regarding older documents contained within the Latham Report, where the temporal nexus is more attenuated, those may nevertheless be subject to separate privilege(s), depending on their content, notwithstanding that they predate the investigation.

Finally, SHU argues that on remand, we should appoint a special adjudicator. Whether to appoint a special adjudicator is left to the discretion of the trial court. Zehl v. City of Elizabeth Bd. of Educ., 426 N.J. Super. 129, 136 (App. Div. 2012). A trial court may enter an order of reference appointing a "special adjudicator only upon approval by the Assignment Judge, and then only when all parties consent or under extraordinary circumstances." R. 4:41-1. When appointed to oversee discovery, a special adjudicator "must examine each document individually and make factual findings" just as the trial court must. Hammock by Hammock v. Hoffman-Laroche, 142 N.J. 356, 382 (1995). As such, we decline to interfere with the trial court's case management, and we leave it to their discretion.

Affirmed in part, vacated and remanded in part for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M. C. Hanley

Clerk of the Appellate Division